STATE OF NORTH CAROLINA v. FRANK EDMOND MILANO

No. 17

(Filed 12 July 1979)

1. Constitutional Law § 48— effective assistance of counsel—failure to request voir dire on identification testimony—failure to request voir dire on searches—failure to object to testimony and manner of cross-examination

Defendant was not denied the effective assistance of counsel in this rape case (1) by the failure of his attorneys to request a voir dire concerning in-court identifications of defendant by three witnesses where all of the witnesses had an ample opportunity to view the defendant, and the record shows no impermissible pretrial identification procedures; (2) by the failure of his attorneys to request a voir dire examination regarding searches of defendant's apartment and car and seizures of a gun and holster introduced into evidence where the record shows that both searches were made pursuant to search warrants, defendant's own direct testimony shows that he consented to a search of his apartment, and the searches were therefore reasonable; or (3) by the failure of his attorneys to object to certain testimony and the manner in which they cross-examined certain witnesses since trial counsel have wide latitude in making strategic and tactical decisions, and since defendant was not prejudiced by the admission of evidence which he now complains may have been excluded had his counsel objected in the light of the overwhelming evidence against him.

2. Rape § 4.3— prior abortion by rape victim—length of pregnancy—exclusion of cross-examination

The exclusion of cross-examination of a rape victim as to the length of her pregnancy when she had an abortion prior to the incident in question cannot be held prejudicial error where the verdict could not have been improperly influenced thereby and the answer the witness would have given is not in the record.

3. Criminal Law §§ 50, 62, 66.3— inherent danger of show-up identification—admissibility of polygraph test—exclusion of opinion testimony

The trial court properly excluded a question asked of a police officer concerning the "inherent danger" of a show-up identification and a question posed to a lie detector examiner relating to the admissibility of a polygraph test in court since the questions called for improper conclusions by the witnesses on questions of law.

4. Bills of Discovery § 6— discovery order—examination of materials during trial

Where defendant claimed during the trial that the State had not completely complied with a pretrial discovery order, the court did not abuse its discretion in ordering that defendant be permitted to examine and copy all reports, statements and photographs at the end of the court day and in giving defendant the right to recall any witnesses he desired. G.S. 15A-910.

State v. Milano

5. **Criminal Law § 62 — polygraph results — stipulation of admissibility**

The trial court in a rape case had the discretion to admit the results of a polygraph test administered to defendant where defendant, his attorney and the assistant district attorney entered into a stipulation that the results of the polygraph test would be admissible in evidence; the court found that the polygraph operator was qualified to administer the test and interpret its results and that the test was administered under proper conditions; and the court properly instructed the jury that the test results could not be considered as evidence of defendant's guilt or innocence but only as evidence relating to defendant's credibility.

6. **Criminal Law § 62 — psychological stress evaluation test — inadmissibility**

The results of a psychological stress evaluation test that had been administered to defendant were not admissible in evidence where there had been no stipulation between the State and the defendant as to the test's admissibility.

7. **Criminal Law § 113.5 — failure to instruct on eyewitness testimony — absence of request**

Although it perhaps would have been the better practice for the trial court to have instructed the jury on eyewitness testimony in this rape case, its failure to do so without a request by defendant did not constitute prejudicial error.

Justice Exum dissenting.

APPEAL by defendant from the judgment of *Barbee, S.J.,* entered in the 18 September 1978 Session of MECKLENBURG County Superior Court.

The defendant was charged, in an indictment proper in form, with first degree rape.

At trial the evidence for the State tended to show the following:

On 17 May 1978 Mrs. Madelyn Monette and her husband were at their home on 4148 Walker Road in Charlotte. The Monettes lived in a duplex, and their door to the outside was on the side of the house facing a house belonging to Ms. Joannie Flippin. There was a gravel driveway between the two buildings. At about 11:00 a.m. Mr. Monette left the house to walk the dog. About five minutes later a brown car with a white top drove into the gravel driveway, and a man, later identified by Mrs. Monette as the defendant, walked up to the Monette's porch. The defendant asked Mrs. Monette if she knew where a Richardson family lived. When she replied no, the defendant asked whether he could

use her phone. Mrs. Monette said she did not have a phone but that her next door neighbor had one and would probably be glad to let him use it. Mrs. Monette then closed the door and went back into her house.

Ms. Joannie Flippin lived next door to the Monettes. About 11:00 a.m. on 17 May 1978 she saw a small brown car with a white top pull into the driveway between her house and the Monette's home. A man, later identified by Ms. Flippin as the defendant, got out of the car and went directly to the Monette's apartment. Shortly, thereafter, Ms. Flippin's doorbell rang, and the defendant was at her door. He stated that he was a friend of her neighbors, who had indicated he might use her phone. After Ms. Flippin let him in the house to use her telephone, she smelled alcohol on his breath and realized he had been drinking.

Although there was a phone next to the front door, the defendant walked past it and into the kitchen. He asked Ms. Flippin for a drink of water, which she gave him. He then dialed a number on the kitchen phone but hung up, saying the line was busy. The defendant proceeded to walk through the entire house uninvited. He dialed a number on the telephone two more times, but both times he declared that the line was busy. The defendant asked Ms. Flippin if she lived there alone. She replied that she lived there with her husband and two children and that her husband was due home right then. Ms. Flippin then insisted that the defendant leave because "I [Ms. Flippin] did not want this man in my house."

Ms. Flippin was suspicious of the defendant, so she watched him out of window on the side on her house, facing the Monette's building. She saw him leave her house and walk right into the Monette's apartment without pausing or knocking. Ms. Flippin then picked up a dental appointment card and wrote down a description of the car: "brown body, white top, small car, Monza." She could not see the license plate at that time.

Mrs. Monette testified that after the defendant had left to use the phone next door, she started vacuuming. Shortly thereafter, she looked up, and the defendant was standing right behind her in her home. The defendant told Mrs. Monette that he had a present for her, and he pulled "a very large handgun" out of his pants. He said, "Don't scream or I'll blow your brains out."

The defendant made Mrs. Monette lie down on the floor. He pulled her pants off, put the gun in her right ear and had sexual intercourse with her for about two or three minutes. Mrs. Monette testified that she did not know whether the defendant ejaculated, but "it wasn't obvious if he did." The defendant got up and walked her to the bathroom with the gun at her head. He told her to take a shower and wash out thoroughly, which she did, as he watched. While Mrs. Monette was in the shower, the defendant left, admonishing her "not to tell anybody or he [the defendant] would shoot me."

Mrs. Monette wrapped a towel around her as the defendant was leaving. Her husband was just returning with the dog, and she began screaming that she had been raped. Mr. Monette testified that "as I was approaching the side of the house I saw this person going down the sidewalk, and I was running with the dog and he turned and looked at me. I was about four feet from him. I saw his face."

Ms. Flippin heard the screams next door, went to her window and saw the defendant coming out of the Monette's house. She watched him get into the car. As he backed out of the driveway, she wrote down the license plate number, JHJ-847, on the card on which she had previously written the car's description. This card was admitted into evidence at trial.

The police were called and arrived at the Monette's house around five minutes later, about 11:25 a.m. Ms. Flippin gave Officer Jones the card on which she had written the car's description and license plate number. Officer Jones called the police dispatcher and found out that the address listed on the car registration was "Whitehall." The police subsequently learned, apparently from the defendant's mother who lives on Whitehall Drive, that the potential location of the car they were looking for was Eastcrest Apartments. A police car was sent to that vicinity, and shortly thereafter Officer Edwards found defendant's car parked at an apartment complex on Eastcrest Drive.

Officer Edwards looked into the defendant's car and saw a brown military-type holster lying on the back seat. He then knocked on the door of defendant's apartment. The defendant came to the door, identified himself as Frank Milano and said that he owned the brown Monza parked outside. The policeman asked

the defendant if he would go with him to Walker Road because his license plate number was given as a possible suspect car in relation to an incident that had occurred there. The defendant agreed to go, and his girlfriend, who is now his wife, went with them in an unmarked police car to the Monette's house, which was about three miles away.

The police car parked in the driveway between the Monette's apartment and Ms. Flippin's house. Ms. Flippin, Mr. Monette and Mrs. Monette came to the car separately, in that order, to look at the defendant. Ms. Flippin and Mr. Monette immediately identified the defendant as the man they had seen earlier that morning. Mrs. Monette stated that when she first went to the car to see the defendant, his head was turned away from her and he would not look at her. Mrs. Monette asked the police to have the defendant get out of the car and stand in front of her. She testified that once the defendant stood up facing her and voluntarily said something, "I [Mrs. Monette] knew it was him. There was no doubt in my mind that it was him." The defendant was then advised of his rights and arrested.

Mrs. Monette was shown an SBI manual containing pictures of various types of guns by Officer Maxwell. She picked out two pictures that resembled the gun her assailant had had. One was a "military type .45 automatic caliber pistol." When the police subsequently searched defendant's apartment, they found a ".45 military style automatic" which was introduced into evidence at trial. In defendant's car they found "a holster for a pistol; military style; large caliber; for automatics" and a car registration card issued to Frank Edward Milano at 3935 Whitehall Drive in Charlotte.

Dr. George W. Robertson examined Mrs. Monette at Charlotte Memorial Hospital on 17 May 1978. He found no "motile sperm" during the pelvic examination. The witness testified that "the absence of sperm does not absolutely mean that intercourse has not taken place. It could mean that intercourse did take place, but there was no ejaculation. . . . It's not terribly uncommon that sperm is not present." The doctor then related what Mrs. Monette had told him of the incident, which corroborated what Mrs. Monette had previously testified to.

The evidence for the defendant tended to show the following:

At about 11:00 a.m on 17 May 1978 Mrs. Rita Milano Irwin, the defendant's mother, went to the defendant's apartment. As she approached the building entrance, she realized that the defendant and his girlfriend, Lynn Feldman, would probably still be asleep because they both worked late at night. Mrs. Irwin then left her calling card on the windshield of defendant's car as a way of asking him to call her. Mrs. Irwin testified that her son was a nice, gentle person. He had been living with her on Whitehall Drive until approximately three weeks before 17 May 1978.

Mrs. Elizabeth Lynn Feldman Milano was the defendant's girlfriend on 17 May 1978. They got married on 6 July 1978 after the defendant was released from custody pending trial.

In May of 1978 Mrs. Milano was working as a bartender at the Spontanes Club. At about midnight on 17 May 1978 the defendant came to the Spontanes Club where she was working. He told her that he had had some trouble that night at the Hitching Post where he worked. A man named Max Simpson or Max Sampson had kneed the defendant in the groin. The defendant was in pain when Mrs. Milano saw him, but he would not let her take him to the emergency room.

When Mrs. Milano got off work about 2:15 a.m. on 17 May 1978, she and the defendant went to a party with some friends. They later left the party and drove to the house of one of the defendant's friends, and the defendant borrowed a gun. When Mrs. Milano asked him what it was for, the defendant told her that he was afraid the man he had had trouble with at work would come to the apartment. Mrs. Milano and the defendant returned home and went directly to bed, at about 6:30 or 7:00 a.m. on 17 May 1978. The defendant always slept on the inside of the bed; therefore, he could not get out of bed without Mrs. Milano knowing it.

Mrs. Milano woke up at about 11:00 a.m., and the defendant was still sleeping. Shortly after 11:30 a.m. the police came to the door asking for the defendant. Mrs. Milano told the officer that the defendant was asleep. She woke him up, and the two of them went with the policeman to Walker Road.

Mrs. Milano's account of what happened at the Monette's house was basically the same as was previously testified to, ex-

cept Mrs. Milano stated that Mr. and Mrs. Monette came out to the car together rather than separately. Mrs. Milano testified that "I am sure that [the defendant] was with me in the apartment at Eastcrest Drive at the time this alleged rape occurred."

Mrs. Milano stated that she had moved the gun to the top shelf of a closet from the counter where the defendant had previously placed it. "When the police officer first came to the apartment that morning [on 17 May 1978], I [Mrs. Milano] moved the gun at that time."

Linda Cunningham testified that the defendant's mother worked at her pet shop. She had known the defendant well for about five and a half years. She stated that the defendant's "reputation is that of pretty good character."

Dr. James Groce is a psychiatrist at Dorothea Dix Hospital. The defendant was sent to that institution for evaluation on 19 May 1978, and he was discharged on 25 May 1978. The defendant's IQ was 106, which is in the upper range of normal intelligence. He was in good physical health and "appeared to be a normal male capable of having sexual intercourse." Dr. Groce testified that the defendant was mentally normal, and "I [Dr. Groce] felt that he could proceed to trial and that he was likely to have known and understood his behavior at the time this alleged incident occurred."

Mr. Lewis Portas, a criminologist with the Charlotte Mecklenburg Crime Laboratory, had examined a sealed rape kit of Mrs. Monette, which included a swab taken from her vagina. Mr. Portas testified that "the examination of the swab from the rape kit gave some indication for the presence of semen; however, I was unable to find any sperm under the microscope."

Ms. Jane Sturman, a criminologist with the Charlotte Mecklenburg Crime Laboratory, examined blood and saliva samples from the defendant and from Mrs. Monette. Ms. Sturman was unable to determine whether the defendant had had any contact with Mrs. Monette because both of them had Type A blood and both of them had A antigen in their saliva.

Mr. John Edward Purvis testified that he had been a friend of the defendant since high school, and they had previously lived

together. In the early morning of 17 May 1978 the defendant came to his house and asked to borrow his gun. The defendant mentioned that he was scared for his girlfriend and that he would return the gun the next day. Mr. Purvis took all the bullets and gave the defendant the gun — "a military .45." The witness identified the gun the police seized from defendant's apartment as his gun that he had loaned the defendant on 17 May 1978.

The defendant testified on his own behalf. He went to work at the Hitching Post on the night of 16 May 1978. At about 11:00 p.m. a man who defendant believed was named Max Sampson came into the club. The man was drunk, and he started a fight with some of the customers. The defendant threatened to call the police, so the man ran out. About five minutes later he returned, and after some heated discussion he kneed the defendant in the groin. The man had threatened the defendant and told him he would find out where he lived. The defendant was scared for his girlfriend because he was leaving for Florida the next day and she would be at his apartment periodically.

Thereafter the defendant closed the club and went to the Spontanes Club where his girlfriend was working. He was upset and in pain. When his girlfriend got off work, they went to a party together. After leaving the party, the defendant stopped at John Purvis' house and borrowed his gun for protection. They then went home, and the defendant took the gun inside and left the holster in the back seat of his car. The defendant and his girlfriend went immediately to bed.

At about 11:45 a.m. the defendant was awakened by his girlfriend, and there was a policeman at the door. The officer asked him about his car. The defendant pointed it out and said it was in the same place he had parked it. The defendant did testify, however, that the window on the passenger side of the car was rolled down, but it had been closed when he had driven it home earlier that morning. The defendant stated that there was an extra ignition key to his car in a tray inside the automobile on the morning of 17 May 1978 when he and his girlfriend were in the apartment sleeping.

The defendant testified that he voluntarily submitted himself to a lie detector test, and that "I [the defendant] answered all the questions truthfully."

Mr. W. O. Holmberg of the Charlotte Police Department is an expert in the field of polygraph examination. He testified for the State during rebuttal evidence. He had administered a polygraph test to the defendant on 14 September 1978. Mr. Holmberg explained that after a test is finished, the subject is given a numerical rating evaluation. If the rating is plus six or above, truthfulness is indicated. A score of minus six or "above," for example minus seven or minus twelve, indicates deception, and a score between minus six and plus six is inconclusive.

Mr. Holmberg asked the defendant three relevant questions during the polygraph test:

"(1) During the morning hours of May the 17th, did you have sex with a white female on Walker Road?

"(2) On May the 17th, between the hours of eleven and twelve p.m., did you force a white female to have sex with you?

"(3) On May the 17th, 1978, did you drive your 1977 Monza to Walker Road?"

The defendant's response to each of these questions was no. Mr. Holmberg testified that defendant's rating relative to the above questions was minus twenty-seven; indicating deception.

The judge submitted the charge of first degree rape to the jury, and they found the defendant guilty. He was sentenced to life imprisonment, and he appealed by right to this Court.

*Shelley Blum for the defendant.*

*Attorney General Rufus L. Edmisten by Assistant Attorney General Rudolph A. Ashton III for the State.*

COPELAND, Justice.

For the reasons stated below, we find no error in defendant's trial.

[1] In his first assignment of error, the defendant claims he was denied effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

In a case dealing with a guilty plea entered on counsel's advice, the United States Supreme Court has stated that the gauge of effective assistance of counsel is not "whether a court would retrospectively consider counsel's advice to be right or wrong, but . . . whether that advice was within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson*, 397 U.S. 759, 771, 25 L.Ed. 2d 763, 773, 90 S.Ct. 1441, 1449 (1970). Speaking of constitutionally ineffective representation claims, this Court has said:

> "The Courts rarely grant relief on the grounds here asserted, and have consistently required a stringent standard of proof on the question of whether an accused has been denied Constitutionally effective representation. We think such a standard is necessary, since every practicing attorney knows that a 'hindsight' combing of a criminal record will in nearly every case reveal some possible error in judgment or disclose at least one trial tactic more attractive than those employed at trial. To impose a less stringent rule would be to encourage convicted defendants to assert frivolous claims which could result in unwarranted trial of their counsels." *State v. Sneed*, 284 N.C. 606, 613, 201 S.E. 2d 867, 871-72 (1974).

This defendant was represented at trial by two privately retained attorneys, Mr. Joel L. Kirkley and Mr. William J. Eaker. He cites several ways in which he feels his trial counsel were inadequate.

The defendant first complains that his counsel did not request a *voir dire* concerning Mr. and Mrs. Monette's and Ms. Flippin's identification of him as the man they saw on 17 May 1978. All these witnesses had an ample opportunity to view the defendant. This Court has previously dealt with an ineffective representation claim based on an attorney's failure to request a *voir dire* concerning a witness' in-court identification, the law of which equally applies to this case:

> "The record indicates no impermissible pre-trial identification procedures. While the defendant's counsel did not request a voir dire examination of the prosecuting witness before she was permitted to identify the defendant in court as her assailant, the record indicates no basis for the belief

State v. Milano

that such an examination would have tainted her in-court identification. . . . Under these circumstances, the failure of counsel to demand a voir dire examination of the prosecuting witness, prior to her in-court identification, cannot be deemed such evidence of ineffective assistance of counsel as to warrant the granting of a new trial." *State v. Mathis,* 293 N.C. 660, 670-71, 239 S.E. 2d 245, 252 (1977).

The defendant next argues that his attorney should have required a *voir dire* examination regarding the searches of defendant's apartment and car, which resulted in the seizures of the gun and the holster that were introduced into evidence at trial. The record shows, however, that these searches were both pursuant to search warrants. Furthermore, the defendant's own testimony on direct examination indicates that he consented to the search of his apartment. Under these facts, we must find that the searches were reasonable. Defense counsel are not required to make frivolous motions or objections to every search regardless of the underlying circumstances. *See Sallie v. North Carolina,* 587 F. 2d 636 (4th Cir. 1978).

The defendant asserts that his counsel were constitutionally ineffective because of the way they handled certain witnesses, either by failing to object to certain testimony or by their own "inept cross-examination."

These claims must fail as grounds for granting the defendant a new trial. Several federal courts have suggested that courts look to the ABA Standards Relating to the Defense Function as "a reliable guide for determining the responsibilities of defense counsel." *Marzullo v. Maryland,* 561 F. 2d 540, 547 (4th Cir. 1977), *cert. denied,* 435 U.S. 1011, 56 L.Ed. 2d 394, 98 S.Ct. 1885 (1978). *See also United States v. DeCoster,* 487 F. 2d 1197 (D.C. Cir. 1973). Section 5.2(b) of the ABA Standards Relating to the Defense Function (App. Draft 1971) states that "[t]he decisions on what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his client." Trial counsel are necessarily given wide latitude in these matters. Ineffective assistance of counsel claims are "not intended to promote judicial second-guessing on questions of strategy as basic as the handling of a witness." *Sallie v. North Carolina,*

*supra* at 640. Moreover, even if some of the evidence of which defendant now complains may have been excluded had his counsel objected to it at trial, defendant has not shown any prejudice to him from its admission in light of the overwhelming evidence against him. *See generally Chambers v. Maroney*, 399 U.S. 42, 26 L.Ed. 2d 419, 90 S.Ct. 1975 (1970).

As this Court noted in *State v. Sneed, supra*, an ineffective representation claim is normally raised in post-conviction proceedings, where the defendant may be granted a hearing on the matter with the opportunity to introduce evidence. When the assertion is made before an appellate court on direct review of a criminal conviction, however, that court is necessarily bound by the record of the trial proceedings below. *See generally* Waltz, *Inadequacy of Trial Defense Representation as a Ground for Post-Conviction Relief in Criminal Cases*, 59 NW U. L. Rev. 289 (1964). On the record before us, we cannot find that defendant was denied constitutionally effective representation at trial. This assignment of error is overruled.

The defendant claims the trial court erred in restricting the scope of his cross-examination of certain of the State's witnesses. We do not agree.

The defendant argues that the court erred in sustaining the State's objections to questions he asked Mrs. Monette concerning her employment history and an abortion she had had several years ago. It appears in the record that the witness later testified before the jury about her past jobs; therefore, the defendant cannot complain of the original exclusion of this evidence. *See, e.g., State v. Lewis*, 281 N.C. 564, 189 S.E. 2d 216 (1972), *cert. denied*, 409 U.S. 1046, 34 L.Ed. 2d 498, 93 S.Ct. 547 (1972).

[2]  Mrs. Monette stated during cross-examination that "I had an abortion when I was seventeen years old in 1975." The defendant then asked her how many months pregnant she was when she had the abortion. The court sustained the State's objection to this question. The jury was sent out of the courtroom, and after hearing counsels' arguments on the matter, the court ruled that "the Court finds that the evidence in reference to the alleged abortion is irrelevant to this offense and the Court hereby orders that

State v. Milano

such evidence is incompetent and inadmissible pursuant to G.S. 8-58.6."[1]

This Court has said that "[t]he limits of legitimate cross-examination are largely within the discretion of the trial judge, and his ruling thereon will not be held for error in the absence of showing that the verdict was improperly influenced thereby." *State v. Chance*, 279 N.C. 643, 652, 185 S.E. 2d 227, 233 (1971), *death penalty vacated in* 408 U.S. 940, 33 L.Ed. 2d 764, 92 S.Ct. 2878 (1972). (Citations omitted.) Furthermore, the answer the witness would have given had she been permitted to reply to the question is not in the record; therefore, we cannot tell whether the court's ruling prejudiced the defendant in any way. *See, e.g., State v. Robinson*, 280 N.C. 718, 187 S.E. 2d 20 (1972). In light of these facts, we do not deem it necessary to rule on defendant's argument that G.S. 8-58.6 unconstitutionally limits a defendant's right to confront the witnesses against him.

[3] During trial the court also sustained the State's objections to a question asked of a policeman concerning "the inherent danger" of a show-up identification and a question posed to the lie detector examiner relating to the admissibility of a polygraph test in court. It was entirely proper for the trial judge to sustain these objections because they called for improper conclusions by the witnesses on questions of law. *See generally State v. Griffin*, 288 N.C. 437, 219 S.E. 2d 48 (1975), *death penalty vacated in* 428 U.S. 904, 49 L.Ed. 2d 1210, 96 S.Ct. 3210 (1976).

---

1. G.S. 8-58.6 states in pertinent part:

"Restrictions on evidence in rape cases.— (a) As used in this section, the term 'sexual behavior' means sexual activity of the complainant other than the sexual act which is at issue in the indictment on trial.

(b) The sexual behavior of the complainant is irrelevant to any issue in the prosecution unless such behavior:

(1) Was between the complainant and the defendant; or

(2) Is evidence of specific instances of sexual behavior offered for the purpose of showing that the act or acts charged were not committed by the defendant; or

(3) Is evidence of a pattern of sexual behavior so distinctive and so closely resembling the defendant's version of the alleged encounter with the complainant as to tend to prove that such complainant consented to the act or acts charged or behaved in such a manner as to lead the defendant reasonably to believe that the complainant consented; or

(4) Is evidence of sexual behavior offered as the basis of expert psychological or psychiatric opinion that the complainant fantasized or invented the act or acts charged.

(c) No evidence of sexual behavior shall be introduced at any time during the trial of a charge of rape or any lesser-included offense thereof, nor shall any reference to any such behavior be made in the presence of the jury, unless and until the court has determined that such behavior is relevant under subsection (b)."

State v. Milano

[4] Pursuant to defendant's motion for discovery, the court entered an order on 14 September 1978 relating to certain matters it deemed the State should disclose to the defendant. In the middle of trial, on 19 September 1978, the court held a hearing on defendant's claim that the State did not completely comply with that order. After the hearing the court ruled that "the Court is not specifically finding that the State has failed to comply with the order. . . , but out of an abundance of precaution, the Court is ordering that the defendant be permitted to inspect and examine [everything the defendant was then asking for]." The defendant was permitted to copy all reports and statements and view all photographs. At defendant's request, this was all done at the end of a court day rather than the next morning so he would have an opportunity to prepare for court. The able trial judge also gave the defendant the right to recall any witnesses he desired.

G.S. 15A-910 sets forth a variety of sanctions a court may employ when a party fails to comply with discovery. G.S. 15A-910(1) authorizes the court to "[o]rder the party to permit the discovery or inspection," which was done in this case. Chief Justice Sharp, speaking for this Court, has stated that "the choice of which [sanction under G.S. 15A-910] to apply—if any—rests entirely within the discretion of the trial judge. His decision will not be reversed except for abuse of that discretion." *State v. Stevens*, 295 N.C. 21, 37, 243 S.E. 2d 771, 781 (1978). There has been no such abuse in this case. This assignment of error is overruled.

[5] On 14 September 1978 the defendant, his attorney and the assistant district attorney working on this case entered into the following stipulation:

"[T]he defendant voluntarily, knowingly and understandingly entered into a stipulation whereby the defendant agreed that Mr. Holmberg was to administer a polygraph test to him and that if the results of such polygraph test were conclusive, either the State or the defendant could offer such evidence in the trial of the case."

The defendant now contends that the trial court erred in admitting the results of the test, regardless of his previous stipulation.

Before the results of the lie detector test were admitted into evidence, an extensive *voir dire* was conducted concerning the

qualifications of the examiner, Mr. Holmberg, the conditions under which the test was conducted and the results of it. The trial court ruled that the results be admitted into evidence, and it made extensive findings of fact and conclusions of law, none of which are disputed by defendant.

The defendant's argument on this issue must fail. It is clear that in North Carolina the results of a polygraph examination are not admissible in evidence absent a valid stipulation by the parties. *State v. Brunson*, 287 N.C. 436, 215 S.E. 2d 94 (1975); *State v. Foye*, 254 N.C. 704, 120 S.E. 2d 169 (1961). When a defendant voluntarily and knowingly enters into a valid stipulation concerning the admissibility of a lie detector test, however, the trial court has the *discretion* to admit the results into evidence, depending upon the examiner's qualifications and the conditions under which the test was administered. *State v. Steele*, 27 N.C. App. 496, 219 S.E. 2d 540 (1975). *See also State v. Williams*, 35 N.C. App. 216, 241 S.E. 2d 149 (1978), *cert. denied*, 294 N.C. 739, 244 S.E. 2d 156 (1978). In this case the trial court specifically found that Mr. Holmberg was "an expert in the conduction and interpretation of a polygraph test and its results" and that "the polygraph test was administered under proper conditions . . . and the results thereof are reliable." All the safeguards set forth in *State v. Steele, supra*, were followed. Thus, the trial court did not err in admitting into evidence the results of the lie detector test.

The defendant also claims the trial court's instructions concerning the results of the polygraph examination were erroneous. We do not agree.

The law is clear that even if the results of a polygraph examination are properly admitted at trial, that evidence cannot be used to show a defendant's guilt or innocence of the crime charged; it may only be used as evidence relating to a defendant's credibility. *State v. Steele, supra.* The trial court instructed the jury on this matter as follows:

"There is evidence tending to show that the Defendant, Mr. Frank Milano, voluntarily submitted to a polygraph or lie detector test. You may not consider this test in determining whether he is guilty. You may consider the results of this test along with all other facts and circumstances in determin-

ing whether the defendant, Mr. Frank Milano, was telling the truth at the time the test was administered."

This instruction was entirely proper. *See State v. Steele, supra.*

[6]  At trial the defendant attempted to get the results of a psychological stress evaluation that had been administered to him into evidence. A thorough *voir dire* was conducted on this matter, and the court ruled the evidence inadmissible. In addition to finding that there had been no stipulation between the State and the defendant as to the test's admissibility, the court found that "there is no sufficient legal basis in this state to make such psychological stress test competent evidence" and that "the reliability of such a psychological stress test has not been sufficiently established to make it competent evidence in this state."

We need not decide whether the psychological stress evaluation has attained "scientific acceptance as a reliable and accurate means of ascertaining truth or deception." *State v. Foye, supra* at 708, 120 S.E. 2d at 171. Assuming, *arguendo*, that the test has reached such a level, it certainly must meet at least the same requirements that have been applied to polygraph examinations in North Carolina, one of which is that there be a written stipulation by the parties as to its admissibility at trial. This assignment of error is without merit.

[7]  After the court finished instructing the jury in this case, he asked both the State and the defendant "whether there are any suggested additional instructions, corrections or modifications." Both parties indicated that they wanted no additional instructions. The defendant now argues that the trial court erred in not instructing the jury on eyewitness testimony.

"The omission to which defendant points by this assignment of error does not concern a substantive feature of the case, and defense counsel did not call this omission to the attention of the trial judge even when he inquired of defense counsel if there were other requested instructions." *State v. Small,* 293 N.C. 646, 659-60, 239 S.E. 2d 429, 438 (1977). Furthermore, the court did fully instruct the jury on defendant's defense of alibi, including a charge that "if upon considering all the evidence in the case, including the evidence with respect to alibi, you have a reasonable doubt as to the defendant's presence at or participation in the

crime charged, you must find [the defendant] not guilty."
Although it perhaps would have been the better practice for the
trial court to have included an instruction on eyewitness
testimony in this case, its failure to do so without a request by
defendant did not constitute prejudicial error. This assignment of
error is overruled.

We have examined defendant's three remaining assignments
of error, Nos. 7, 8, and 9, and find them without merit.

For the foregoing reasons, we find that defendant had a trial
free from prejudicial error.

No error.

Justice EXUM dissenting.

To admit in evidence against defendant the results of a
polygraph examination which he "failed" while at the same time
excluding from evidence the fact that defendant "passed" a
psychological stress evaluation was so fundamentally unfair in the
context of this case as to deny defendant due process of law
under the rationale of *Chambers v. Mississippi*, 410 U.S. 284
(1973). In *Chambers* defendant was tried and convicted of the
murder of one "Sonny" Liberty. The shooting of Liberty, a
policeman, allegedly occurred in a barroom which Liberty had
entered to execute an arrest warrant for one C. C. Jackson. Liber-
ty was shot three times in the back. He then fired his riot gun
into an alley from which the shots appeared to have come. One of
these shots struck Chambers as he ran down the alley. Chambers
was utlimately charged with and convicted of Liberty's murder.
At trial Chambers' defense was not only that he did not shoot
Liberty but that one Gable McDonald had actually done the
shooting. Prior to Chambers' trial McDonald had confessed to the
shooting. McDonald had subsequently repudiated this confession,
however, saying he confessed at the importuning of one Reverend
Stokes who had promised him that he would not go to jail and
would share in the proceeds of a lawsuit Chambers would bring
against the town where the shooting occurred.

At Chambers' trial he called McDonald as a witness and
through him was able to get admitted into evidence McDonald's
written, sworn, out-of-court confession. The state on cross-

examination elicited from McDonald the fact that he had repudiated his confession and his reasons for doing so. After the state's cross-examination Chambers renewed an earlier motion to examine McDonald as an adverse witness. This motion was denied on the basis of Mississippi's "voucher rule" which precluded a party from cross-examining his own witness unless the witness testified adversely to the party calling him. Since McDonald had not, under Mississippi's rule, testified adversely to Chambers, Chambers was denied the opportunity to cross-examine him. Chambers also sought to offer the testimony of three witnesses to whom McDonald had admitted shooting Liberty. This testimony was not allowed at trial. On the basis of Mississippi's voucher and hearsay rules, respectively, the Mississippi Supreme Court found no error in either of these rulings.

In the United States Supreme Court defendant contended "that the application of these evidentiary rules rendered his trial fundamentally unfair and deprived him of due process of law." The United States Supreme Court, with only Justice Renquist dissenting on a procedural ground, agreed with this contention. While it was critical of the Mississippi rules of evidence it nevertheless recognized that they were the rules which had been traditionally applied by the Mississippi Supreme Court. Nevertheless the United States Supreme Court concluded that the application of these evidentiary rules under the circumstances denied Chambers "a trial in accord with traditional and fundamental standards of due process." 410 U.S. at 302. It said further, *id.* at 302-03:

> "In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial."

In the case before us defendant offered the testimony of Mr. Andy Nichols, an instructor in the Criminal Justice Department of Central Piedmont Community College in Charlotte, to the effect that on 16 August 1978 Nichols had examined defendant using a psychological stress evaluator (sometimes called an audio

stress evaluator). This test indicated that defendant was telling the truth when he denied being involved in a sexual encounter with Mrs. Monette. It was stipulated that Nichols was a qualified expert in such examinations. The testimony of Nichols together with other evidence offered by defendant on the question indicated that the psychological stress evaluator was a device for measuring stress in the human voice and that as a "lie detection" device it was as reliable, if not more reliable, than the polygraph. All evidence relating to this examination was ruled inadmissible by the trial judge.

After defendant rested, the state was permitted to offer in rebuttal the testimony of W. O. Holmberg, a police officer with the City of Charlotte. He testified that on 14 September 1978 he examined defendant using a polygraph and that in his opinion, based on the polygraph examination, defendant "indicated deception" when he denied a sexual encounter with Mrs. Monette.

It was brought out on a voir dire hearing that after defendant "passed" the psychological stress evaluator test administered by Nichols, he and the state stipulated that he would submit to a polygraph examination to be administered by Holmberg and, further, that the results of the polygraph examination would be admissible in evidence whether offered by the state or the defendant.

This Court has consistently held that polygraph examination results are inadmissible. *State v. Jackson*, 287 N.C. 470, 215 S.E. 2d 123 (1975); *State v. Brunson*, 287 N.C. 436, 215 S.E. 2d 94 (1975); *State v. Foye*, 254 N.C. 704, 120 S.E. 2d 169 (1961). In *Foye* defendant was given a new trial because of the introduction of testimony that a "lie detector" test administered to him indicated that he was telling the truth when he confessed to the murder with which he was charged. The reasons given in *Foye* for excluding the results of polygraph tests were: (1) there is no "general scientific recognition of the efficacy of such tests"; (2) such evidence distracts the jury from the real questions before it; (3) "it would permit the defendant to have extra-judicial tests made without the necessity of submitting to similar tests by the prosecution"; and (4) "the lie detecting machine could not be cross-examined." 254 N.C. at 708, 120 S.E. 2d at 172. The decision and reasoning of *Foye* were reaffirmed in *Brunson* in which this

Court noted that "the weight of authority still supports that deci-sion." 287 N.C. at 445, 215 S.E. 2d at 100.

The Court of Appeals in *State v. Steele*, 27 N.C. App. 496, 219 S.E. 2d 540 (1975), held that under certain circumstances, which included a stipulation of admissibility, polygraph examina-tion results could be admitted. This Court, until the majority's decision today, has never so held. I agree with the majority that the conditions precedent to admissibility of polygraph results as set out in *Steele* were followed here. I also agree with the majori-ty's acceptance of the *Steele* decision itself.

The trial court, relying essentially on the stipulation of ad-missibility voluntarily entered into by the defendant and his voluntary participation pursuant thereto in the polygraph ex-amination, ruled that testimony regarding it was admissible. Because, however, of the absence of a similar stipulation regard-ing the psychological stress evaluator test the trial court ruled that its results were inadmissible.[1]

Defendant's counsel should have insisted that the admissibili-ty stipulation, if made at all, include both tests. I concede that because the admissibility stipulation did not include the psychological stress evalutor examination the trial court, from the strict standpoint of our law of evidence, ruled correctly as to both tests. The effect, however, of these rulings was so fundamentally unfair in the context of other evidence in this case as to deny defendant due process of law. To insure that fairness in the pro-ceeding which our constitutions demand the trial judge should have either (1) exercised his discretion to rule inadmissible evidence relating to the polygraph or (2) recognized that strict ap-plication of the rules of evidence would, under these cir-cumstances, deny due process to defendant and admitted results of both tests.

I stress as did the United States Supreme Court in *Chambers* the factual context in which the evidentiary questions arose. Defendant here has consistently denied his guilt both prior to trial and as a witness at trial. He put up a strong, affirmative

---

1. The trial court's conclusions that "there is no sufficient basis in this state to make such psychological stress test competent evidence" and "the reliability of such . . . test has not been sufficiently established to make it competent evidence" are, as the majority notes, not determinative. The same conclusions would apper-tain, in this state, to the polygraph. All the evidence in this record is that the psychological stress evaluation is as reliable, if not more so, than the polygraph.

defense which included a corroborated alibi; evidence of his good character and lack of any prior criminal activity; a reasonable explanation of his possession of the firearm; testimony by Lynn Feldman Milano, then his girlfriend and now his wife, that she was physically present with him at the time the incident with Mrs. Monette allegedly occurred; and evidence of a painful injury to his groin the evening before the incident in question. All of this, if believed, renders defendant an extremely unlikely rapist.

On the other hand the state's evidence, while seemingly strong, raises, in my judgment, nagging doubts upon close examination. At the heart of the dispute in this case was whether defendant had, in fact, driven his automobile sometime after 11:00 a.m. on 17 May 1978 to the apartment complex of Mrs. Monette. Defendant claimed the car was last driven between 6:30 and 7:00 a.m. and told police it was in the same position when they found it as it was when he parked it in the early morning hours. Police located his car between 11:30 a.m. and 12:00 Noon. At that time had the car been recently driven its engine would have been warm. Yet the state offered no evidence that the engine was warm or that it had or had not been checked for warmth by the investigating police.

Further, Mrs. Monette identified her assailant to police as being stockily built, five feet eight inches tall with dark hair and brown eyes. She told Dr. Robertson that he was five feet ten inches tall and weighed 165 pounds. In fact defendant was five feet five inches tall, weighed 140 pounds and had hazel eyes. Moreover, Dr. Robertson found no evidence of trauma to Mrs. Monette's genitalia and no real evidence of recent sexual intercourse.

The strength of the state's case as opposed to defendant's was, of course, for the jury and not this Court to weigh and consider. I mention it to show only that the case is not "open and shut" on the question of whether a rape occurred; if anything, it is even closer on whether defendant was indeed the rapist. It comes down to a question of which side the jury believes. In this context, evidence of defendant's failure of a polygraph examination was devastating to his defense and, in effect, insured his conviction. Whether admission of this evidence coupled with exclusion of evidence that he had passed a psychological stress evaluation denied him that fundamental fairness which constitutional

due process demands is a question which this Court should address notwithstanding the trial court's technically correct application of our rules of evidence. Having addressed it, I am satisfied defendant, like Chambers, was denied due process and is entitled to a new trial.