STATE OF NORTH CAROLINA
v.
CHRISTOPHER MARK LYLES.
No. COA06-198
North Carolina Court of Appeals
Filed February 20, 2007
This case not for publication
Attorney General Roy Cooper, by Special Deputy Attorney General James P. Longest, Jr., for the State.
Appellate Defender Staples Hughes, by Assistant Appellate Defender Keischa M. Lovelace, for defendant-appellant.
WYNN, Judge.
"Ineffective assistance of counsel claims are not intended to promote judicial second-guessing on questions of strategy as basic as the handling of a witness."[1] Here, Defendant argues he was substantially prejudiced by his trial counsel's decision to call a defense witness who offered testimony damaging to Defendant's credibility and defense. Because we find the decision to call the defense witness to be the type of tactical decision within an attorney's professional judgment that should not be judicially second guessed, we uphold Defendant's conviction.
On 3 April 2005, Defendant Christopher Mark Lyles was arrested and charged with the misdemeanor crimes of communicating threats and assault on a female. After being found guilty in district court in May 2005, Defendant appealed the verdict in an October 2005 jury trial in Superior Court.
Three witnesses testified at Defendant's trial: the alleged victim, Catherine Moore, for the State; his friend David Braswell, for the defense; and, Defendant himself. Moore and Defendant offered differing accounts of what happened on 3 April 2005, the night in question, though both agreed that some sort of altercation between them took place at a laundromat nearby to Hux's Billiards pool hall. A pool tournament was taking place that night at Hux's, and Defendant, Braswell, and Moore had all gone to watch. Moore was also doing laundry at a laundromat close to Hux's, while watching her boyfriend play in the tournament.
Moore's and Defendant's accounts conflict as to whether the two saw or paid any attention to each other in Hux's; nevertheless, both acknowledge several years of bad blood and past confrontations between them. Moore testified that, after the tournament ended, she went to the laundromat to get her clothes; on her way back, someone kicked her twice in the bottom from behind. She turned around and saw Defendant, at which point she pulled a knife from her pocket, exposed the blade, and told Defendant to "just let [her] do this laundry." Defendant replied, "You B. Pull a knife on me[,]" and walked over to his car, which was parked midway between Hux's and the laundromat. Moore ran into the laundromat, picked up the receiver from a courtesy telephone, and asked the attendant to call 911. Defendant came inside with "a long tire tool" in his hand. Moore held the knife and pretended to call the police. Defendant yelled at her to hang up the phone and threatened "to kill [her], that [she] might as well go ahead and hang up the phone because he was just going to finish [her] off." He then walked out of the laundromat, at which point Moore walked outside to a pay phone next to the laundromat and called the police while a security guard from a nearby bingo parlor stood beside her.
Defendant's friend, David Braswell, testified that he had not seen Defendant or Moore interact while at Hux's, but that Defendant had already left Hux's when Braswell also left the pool hall for approximately an hour in the late afternoon. When he returned at about 5:30 p.m., Defendant was standing in the pool room watching a game, and his car was parked in front of a barbershop. Moore was standing outside at a phone booth. Defendant came and sat with Braswell until a police officer arrived. On cross examination, Braswell conceded that it was "very possible" that Defendant could have returned to Hux's while Braswell was gone, and that he had "no way of knowing." He also described Moore's demeanor at the phone booth, saying she was "hollering and crying" and appeared to be "very upset." Braswell further testified on cross-examination that he did not think Moore was faking her distress, but he "didn't know what" had happened.
Lastly, Defendant told the jury that Moore pulled a knife behind him while they were both in Hux's, although she then "stuck something under her arm" and went to sit with her boyfriend. He testified that, at the end of the tournament, he went out to his car, planning "to leave and ride somewhere and come back," but was approached by Moore with a knife, saying "she was tired of this S-H-I-T, [and was not] putting up with it anymore." She started swinging at Defendant with a knife and threatened "to cut [his] guts out." Defendant opened the car's front door to place a barrier between him and Moore, then opened the back door, reached into his back seat, and retrieved his tire tool. Moore then told Defendant that "she was going to blow [his] F'ing brains out[,]" and walked toward the laundromat. Because she had previously brandished a gun at him, Defendant followed her into the laundromat and saw her reach into her laundry basket. Defendant came toward her, thinking she had a gun. Moore pretended to call the police on the laundromat's "house phone," but when Defendant was not fooled, she began to cry and "act[] like she [was] hurt." Defendant asked Moore for her knife, and she then lay down on the floor as though "she didn't know whether to act like she was crying or get up and start slashing at [him] again." Satisfied that Moore did not have a gun, Defendant left the laundromat, put the tire tool back in his car, and returned to the pool room. He denied ever threatening to kill Moore or "to F her up" but conceded he might have kicked her in the hand while fending off her knife attack at the car.
Defendant was acquitted of the charge of assault on a female but convicted by the jury on the charge of communicating threats. He now appeals from the trial court's judgment and sentence to 120 days' imprisonment, contending that his counsel rendered constitutionally ineffective assistance by calling Braswell as a witness. Defendant argues Braswell's testimony was substantially prejudicial because it offered nothing of benefit to his defense and was more consistent with Moore's testimony than his own, thereby bolstering her credibility and damaging Defendant's. To the extent that this Court finds the record on appeal to be insufficient to review his ineffective assistance claim, Defendant asks that we dismiss the claim without prejudice to file a motion for appropriate relief in the trial court. See State v. Fair, 354 N.C. 131, 167, 557 S.E.2d 500, 525 (2001), cert. denied, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002).
Claims of ineffective assistance of counsel may be resolved on direct appeal "when the cold record reveals that no further investigation is required, i.e., [when the] claims . . . may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing." Id. at 166, 557 S.E.2d at 524. We conclude that the record here is sufficient to allow review of Defendant's claim without the development of additional evidence and will therefore address its merits.
To establish a denial of his constitutional right to counsel, a defendant must satisfy a familiar two-prong test:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the"counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
State v. Braswell, 312 N.C. 553, 562, 324 S.E.2d 241, 248 (1985) (quoting Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693 (1984)) (emphasis omitted). "[R]elief based upon such claims should be granted only when counsel's assistance is `so lacking that the trial becomes a farce and mockery of justice.' " State v. Montford, 137 N.C. App. 495, 502, 529 S.E.2d 247, 252 (quoting State v. Pennell, 54 N.C. App. 252, 261, 283 S.E.2d 397, 403 (1981), disc. review denied, 304 N.C. 732, 288 S.E.2d 804 (1982)), cert. denied, 353 N.C. 275, 546 S.E.2d 386 (2000).
It is well established that an attorney's tactical decisions within the broad ambit of reasonable professional judgment will not give rise to an ineffective assistance claim. See State v. Langley, 173 N.C. App. 194, 200, 618 S.E.2d 253, 257 (2005) (citations omitted), disc. review dismissed and denied, 360 N.C. 366, 630 S.E.2d 447 (2006). Our Supreme Court has emphasized the deference accorded to counsel in such matters:
[T]he decisions on what witnesses to call, whether and how to conduct cross examination, . . . what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his client. Trial counsel are necessarily given wide latitude in these matters. Ineffective assistance of counsel claims are not intended to promote judicial second-guessing on questions of strategy as basic as the handling of a witness.
State v. Milano, 297 N.C. 485, 495, 256 S.E.2d 154, 160 (1979) (emphasis added) (internal quotation marks omitted), overruled on other grounds, State v. Grier, 307 N.C. 628, 300 S.E.2d 351 (1983).
After a careful review of the trial transcript, we conclude that counsel's decision to call Braswell as a witness was the very type of tactical decision not subject to scrutiny under the Sixth Amendment based upon a defendant's dissatisfaction with the outcome at trial. See Pennell, 54 N.C. App. at 263, 283 S.E.2d at 404 (rejecting ineffective assistance claim challenging counsel's decision to call the defendant's mother as a witness). Even assuming that Braswell's testimony was, on balance, detrimental to the defense, Defendant's assertion that his testimony held no positive value is without merit. Braswell portrayed Defendant as keeping to himself in Hux's, staying near the front door, and neither approaching Moore nor leaving the pool hall to follow her outside. Braswell's appearance had the additional value of portraying Defendant to the jury as a person out socializing with a friend on 3 April 2005, rather than as an isolated individual bent on menacing Moore. Indeed, had Braswell not testified, Defendant might have been left to explain on cross-examination why he chose not to call a witness who could have accounted for his whereabouts and movements throughout the relevant time period. We find nothing in Braswell's testimony that would render Defendant's trial a "a farce and mockery of justice. " Braswell did not contradict Defendant on any material issue of fact. He did not purport to see any of the actual confrontation between Defendantand Moore. Many of the discrepancies between Defendant's and Braswell's accounts of the events inside Hux's involved minor details such as Defendant's exact location at a given time. Such differences could have been understood by the jury as a natural consequence of the six months that separated the incident from the trial. The remaining variances cited by Defendant involved matters of Braswell's subjective perception or opinion. A jury may allow for the differing perceptions of two witnesses without concluding that one of them is not credible. For example, while Braswell could offer his own perceptions on the matter, he could not know when and under what circumstances Defendant and Moore first made eye contact. Moore acknowledged looking frequently at Defendant inside Hux's in order to keep track of his location. Finally, although Braswell did describe Moore's apparent distress at the pay phone, we note that Defendant likewise depicted Moore as crying and lying down on the floor in the laundromat, and that Braswell did not corroborate Moore's account of a security guard standing with her.
We find no merit to Defendant's assertion that his counsel's decision to call Braswell as a witness amounted to an abdication of his constitutional role as advocate. Without Braswell's testimony about Defendant's behavior in Hux's, the jury might well have found him guilty of assault on a female, believing that he followed Moore outside in order to kick her. Although counsel is responsible for investigating a prospective witness' likely testimony, he cannot control what a witness says on the witness stand, nor can he direct the State's cross-examination. Because we find neither manifest unreasonableness by counsel nor the probability of a more favorable outcome had Braswell not testified, we overrule Defendant's assignment of error. See State v. Frazier, 142 N.C. App. 361, 368, 542 S.E.2d 682, 687 (2001) ("If this Court `can determine at the outset that there is no reasonable probability that in the absence of counsel's alleged errors the result of the proceeding would have been different,' we do not determine if counsel's performance was actually deficient.") (quoting Braswell, 312 N.C. at 563, 324 S.E.2d at 249).
The record on appeal contains additional assignments of error not addressed by Defendant in his brief to this Court. We therefore deem them abandoned. See N.C. R. App. P. 28(b)(6).
No error.
Judges ELMORE and GEER concur.
Report per Rule 30(e).
NOTES
[1] State v. Milano, 297 N.C. 485, 495, 256 S.E.2d 154, 160 (1979), overruled on other grounds, State v. Grier, 307 N.C. 628, 300 S.E.2d 351 (1983).