STATE OF NORTH CAROLINA v. CHARLES ALLEN GRIER

No. 258A82

(Filed 8 March 1983)

1. **Criminal Law §§ 42.6, 55— blood sample—chain of custody sufficient**

    The chain of custody of a blood sample taken from the victim in a prosecution for first degree rape was sufficiently established where a doctor testified that she examined the victim shortly after the rape and that, although she did not actually see the blood drawn from the victim, she signed a blood sample that was supposedly taken from the victim by a laboratory technician either immediately before or after the examination.

2. **Criminal Law § 62— stipulation concerning lie detector test—inconclusive results improperly excluded**

    Where the defense and prosecution stipulated that an inconclusive result of a polygraph examination should not be admitted into evidence, and where the defendant took a polygraph examination and the result was inconclusive, and where the defendant took a second polygraph examination and the result indicated he was being deceptive, the trial court erred in refusing to allow defendant to cross-examine the examiner concerning the prior inconclusive polygraph result. The reasons justifying exclusion of an inconclusive result do not apply when conclusive results are achieved on a second test pursuant to the same stipulation and the prior inconclusive results are offered only to impeach the examiner's testimony as to the conclusive results.

**3. Criminal Law § 62— polygraph evidence not admissible in any trial**

In North Carolina, polygraph evidence is no longer admissible in any trial even if the parties stipulate to its admissibility.

Justice FRYE did not participate in the consideration or decision of this case.

APPEAL by defendant from *Ferrell, Judge*, at the 15 February 1982 Criminal Session of MECKLENBURG County Superior Court.

Defendant was charged in indictments, proper in form, with the offenses of first-degree rape and first-degree burglary. He entered a plea of not guilty to each of the offenses charged.

The State offered evidence tending to show that at about 12:30 a.m. on 22 September 1981, James Lee was watching television in the living room of his duplex apartment at 2026 Thomas Avenue, Charlotte, North Carolina, when a tall black man broke open a locked storm door, entered the living room and placed a gun to Lee's head. Lee's wife had been asleep in her bedroom. She wakened and came down the hallway toward the living room. The black intruder, later identified as defendant, forced Mr. and Mrs. Lee to accompany him into the bedroom where he took Mr. Lee's money and forced the couple to lie down on the bed. While aiming the gun at her husband's head, defendant forced Mrs. Lee to have sexual intercourse with him.

Defendant then left the bedroom to search the house for other valuables. Meanwhile, James Lee obtained his shotgun and confronted defendant as he was preparing to leave carrying the Lees' television set. Lee fired at defendant but missed. As defendant fled from the apartment, he turned and shot at Lee two or three times. Lee again fired at defendant from the porch but defendant escaped without injury.

Both Mr. and Mrs. Lee testified that when they came out of the bedroom after the rape, a second black man was in the living room rummaging through Mrs. Lee's purse and gathering other items. This second intruder demanded and received some money and Mr. Lee's ring before fleeing.

Neither of the Lees was able to identify defendant from a photographic lineup conducted eight days after the incident. Mrs. Lee did, however, select defendant from a physical lineup held on

2 October 1981 and also identified defendant in court as the man who first entered the house. Mr. Lee could not identify defendant at the physical lineup, nor could he make a positive identification at trial.

Mr. and Mrs. Lee testified that immediately after the crime was committed, they described the first intruder as having a full beard, an afro and wearing white clothes trimmed with red. Their descriptions of the man's height varied significantly, from Mr. Lee's estimate of six feet, eight inches, to Mrs. Lee's statement that the intruder was six feet tall. The officer who conducted the lineup testified that defendant is five feet, nine inches tall.

On 1 October 1981, Officer Cobb searched defendant's residence in an effort to locate the clothes described by the Lees and the items taken from their home. The only item found was a pair of white trousers.

The State presented testimony of Ronnie Easterling. Easterling had been arrested for an unrelated armed robbery and was under suspicion as resembling the composite picture of the second man who entered the Lees' apartment. Easterling testified that he overheard defendant telling someone that he had been involved in a "lick," a stealing, on Thomas Avenue. He further testified that he heard defendant say the incident had been reported on television, that the old man had shot at him, and that buckshot brushed across his head.

Officer J. A. Welborne testified that he went to the Lee apartment on 22 September 1981 and collected, *inter alia*, a hair pick containing several hairs and the sheet from Mrs. Lee's bed. Dr. Louis Portis of the microanalysis section of the Charlotte-Mecklenburg crime laboratory compared the hairs taken from the pick with hairs removed from defendant. It was his opinion that the two hair specimens were consistent.

Jane Burton, a criminalist with the Charlotte-Mecklenburg crime laboratory, determined that stains on the sheet and on Mrs. Lee's dress revealed the presence of human semen. She testified that the semen stains were consistent with defendant's blood type and inconsistent with Mrs. Lee's.

The State presented testimony of W. O. Holmberg, an expert in polygraph examination and chart interpretation. Holmberg had

earlier administered two polygraph examinations to defendant, the first on 22 January and the second on 27 January 1982. Holmberg deemed the results of the first examination inconclusive. It was his opinion, however, that the results of the second examination indicated that defendant's answers were deceptive.

Prior to Holmberg's testimony, defense counsel moved to exclude it unless the court would permit defendant to cross-examine Holmberg concerning the inconclusive results obtained from the first examination. The trial court ruled that defendant would not be allowed to cross-examine Holmberg regarding the 22 January 1982 examination because a stipulation entered into between the State and defendant provided that inconclusive results would not be admissible for any purpose. Holmberg's testimony, then, was confined to his interpretation of the results obtained from the examination conducted on 27 January.

Defendant presented evidence in the nature of an alibi. He testified that on the night in question, he was at home drinking beer and watching television with his girl friend, his brother and his brother's date. He recalled that his sister came by that evening and told him she was getting married. Defendant's brother and sister also testified that defendant could not have perpetrated the crime because he was with them throughout the evening of 21 September 1981. Defendant's sister said that she remained at defendant's apartment until 1:30 or 2:30 the following morning and that defendant did not leave his residence at any time during the night or early morning. She also stated that she had never known her brother to have a full beard.

On 17 February 1982, the jury returned verdicts of guilty on both the charge of first-degree rape and the charge of first-degree burglary. Defendant was sentenced to life imprisonment on each charge. Defendant appealed directly to this Court as a matter of right pursuant to G.S. 7A-27(a).

*Rufus L. Edmisten, Attorney General, by Robert L. Hillman, Assistant Attorney General, for the State.*

*Adam Stein, Appellate Defender, by Marc D. Towler, Assistant Appellate Defender, for defendant-appellant.*

BRANCH, Chief Justice.

I.

[1]  Defendant assigns as error the trial court's admission into evidence of a blood sample purportedly taken from the victim and the admission of testimony concerning the results of blood typing tests performed on the sample.

The State presented evidence of the victim's blood type in an effort to show that semen stains found on the dress Mrs. Lee was wearing on the night of the rape and on the sheets removed from her bed were consistent with defendant's blood type and inconsistent with Mrs. Lee's. Criminalist Jane Burton's testimony tended to show that the blood characteristics of the stains did not match Mrs. Lee's. The stains were, however, totally consistent with defendant's blood groupings. In fact, Burton testified that defendant's blood characteristics, an A reaction in the ABO grouping and a 2-1 reaction in the PGM grouping, were shared by only 11% of the population.

Defendant maintains that the evidence regarding the inconsistency of the victim's blood type should have been excluded because there was no evidence establishing that the blood tested was actually taken from the victim.

Dr. Rita Kay Williams examined the victim shortly after the rape on 22 September 1981. She testified that although she did not actually see the blood drawn from Mrs. Lee, she signed a blood sample that was supposedly taken from the victim by a laboratory technician either immediately before or after the examination. The technician who drew the blood did not testify.

Defendant, relying on *Robinson v. Life and Casualty Ins. Co.*, 255 N.C. 669, 122 S.E. 2d 801 (1961), argues that the chain of custody was insufficient to permit submission of evidence concerning the blood test. His position is that the person who actually draws the blood specimen must testify in order to lay a proper foundation for the admission of this evidence.

We do not interpret *Robinson* to hold that the person who draws the blood must testify in every case in order to establish a proper foundation for the admission of this evidence.

In *Robinson*, the issue was whether the deceased insured had been drinking at the time of an accident. Defendant attempted to offer a coroner's report indicating that the deceased was intoxicated when the collision occurred. This Court upheld the trial court's ruling excluding that report because there was no evidence as to who took the sample or when the sample was taken. The lack of such evidence was crucial in *Robinson* because it was necessary to determine whether the sample had been taken before or after the deceased had been injected with embalming fluid. There was, then, good reason to require specificity as to who drew the blood and when the blood was drawn since the injection of embalming fluid would obviously taint any findings as to the presence of alcohol in the bloodstream.

*Robinson* is easily distinguished from the case before us. Here no foreign matter had been injected into the bloodstream of the victim. The uncontested evidence shows that a sample of Mrs. Lee's blood was taken in accordance with normal hospital procedure. The laboratory technician took the sample concomitantly with Dr. Williams' examination of the victim. The vial purportedly containing Mrs. Lee's blood was signed by Dr. Williams immediately upon its presentation to her by the technician. We, therefore, find defendant's reliance upon *Robinson* misplaced. Rather, we are of the opinion that the question before us is controlled by *State v. Detter*, 298 N.C. 604, 260 S.E. 2d 567 (1979). There, defendant argued that a chain of custody was insufficient because it was not shown which laboratory employee picked up the deceased's specimens at the post office and because several people had supervision over the bench where the specimens were first placed. We held in *Detter* that the chain of custody of the deceased's specimens was sufficiently established because "the possibility that the specimens were interchanged with those from another body [was] too remote to have required ruling this evidence inadmissible." *Id.* at 634, 260 S.E. 2d at 588.

Here, as in *Detter*, the possibility that Mrs. Lee's blood sample was confused with someone else's is simply too remote to require exclusion of this evidence. Any weakness in the chain of custody relates only to the weight of the evidence and not to its admissibility. *Id.* This assignment of error is overruled.

State v. Grier

## II.

[2] Defendant next assigns as error the trial court's denial of his motion to exclude testimony regarding conclusive results of a polygraph examination since defense counsel was not permitted to cross-examine the polygraphist regarding an earlier test, the results of which were deemed inconclusive.

The trial court permitted polygraph examiner W. O. Holmberg to testify to the results of a polygraph test he administered to defendant on 27 January 1982. Holmberg's opinion was that defendant's answers denying involvement in the burglary at the Lee home were deceptive. The court refused, however, to permit defendant to cross-examine Holmberg regarding the earlier test administered on 22 January 1982. In determining that the results of the first examination were inadmissible, the trial judge relied on the following provision of a stipulation entered into between the parties:

> 5. That the results of the polygraphic examination so taken or offered shall be admissible into evidence in the trial of the above styled case(s) irrespective of the results, except that if the results of such examination are deemed inconclusive by the operator, then such inconclusive results will not be admissible for any purpose by either side, and that the undersigned hereby agree to waive any and all objections to the testimony of the results as to the competency, weight, relevancy, remoteness, or admissibility of such testimony based upon public, legal, judicial, social policy, due process of law, and/or such rules of evidence as might otherwise govern.

The trial court ruled that the language prohibiting inconclusive results was absolute and that no evidence regarding inconclusive results was permissible under any circumstances.

We do not agree. It is our conclusion that the language forbidding the introduction of inconclusive results was intended to cover the situation where the *only* results obtained were inconclusive. In our opinion, the parties simply did not contemplate the exclusion of inconclusive results when a series of examinations were conducted and the examiner interpreted the results of these examinations inconsistently.

There are sound reasons for excluding an inconclusive result when no other results are obtained. An inconclusive result, standing alone, is meaningless. It does not tend to show the defendant's propensity to tell the truth, nor does it lead to the conclusion that he is deceptive. It is simply irrelevant for purposes of weighing the defendant's credibility.

These reasons justifying exclusion do not apply, however, when conclusive results are achieved on a second test pursuant to the same stipulation and the prior inconclusive results are offered only to impeach the examiner's testimony as to the conclusive results. An inconclusive result takes on an added significance when other conclusive results are introduced. Where, as here, the same examiner administers two polygraph tests to defendant within five days and he interprets the results inconsistently, this calls into serious question the inherent reliability of the polygraph as an accurate detector of the subject's truthfulness or deception. Furthermore, this inconsistency tends to cast doubt on the expert's capability to reach a definitive conclusion regarding the test results. If defendant had been permitted to introduce this evidence that the examiner had earlier been unable to determine whether or not defendant was deceptive, this would have diminished the impact of the State's evidence that defendant had "failed" a lie detector test.

We, therefore, conclude that the trial judge erred in construing the stipulation so as to preclude defendant from cross-examining the polygraphist regarding the inconclusive results obtained from the first polygraph examination.

The nature of any scientific testimony requires the fullest possible exploration at trial. The right to a full and thorough cross-examination is especially important, however, when evidence regarding the procedure, theory and results of a polygraph examination is presented. Even a cursory examination of the cases and journals discussing this subject reveals a significant division of opinion regarding the effectiveness of the polygraph as a means of detecting deception. *See, e.g.,* J. Reid and F. Inbau, *Truth and Deception* (2d ed. 1977); Abbell, *Polygraph Evidence: The Case Against Admissibility in Federal Criminal Trials*, 15 Am. Crim. L. Rev. 29 (1977); Skolnick, *Scientific Theory and Scientific Evidence: An Analysis of Lie-Detection*, 70 Yale L.J. 694

(1961); Tarlow, *Admissibility of Polygraph Evidence in 1975: An Aid in Determining Credibility in a Perjury-Plagued System*, 26 Hastings L.J. 917 (1975); Comment, *The Polygraph: Perceiving or Deceiving Us?*, 13 N.C. Cent. L.J. 84 (1981); Case Comment, *Commonwealth v. Vitello: The Role of the Polygraph in Criminal Trials Under Massachusetts Law and the Federal Rules of Evidence*, 15 New Eng. L. Rev. 837 (1980); Note, *Polygraph: Short Circuit to Truth?*, 29 U. Fla. L. Rev. 286 (1977).

Even if the accuracy of the machine as a measuring device and the operative theory of the polygraph is accepted, this is not the end of the inquiry regarding the validity of the polygraphic process. All courts and commentators concede that the most important factor to be considered when evaluating the reliability and utility of the polygraph is the role of the examiner. "The examiner's training, competence, experience, integrity and conduct during the test is as critically important to the reliability of the polygraph as the machine and the examinee." *State v. Dean*, 103 Wis. 2d 228, 236, 307 N.W. 2d 628, 632 (1981).

The examiner must first acquaint himself with the facts of the crime and become familiar with the examinee's background. He or she must determine whether the examinee is psychologically and biologically suitable for testing. The examiner conducts a pre-test interview, prepares the test questions and asks them during the examination, supervises the examinee's behavior during the examination, conducts a post-test interview and, finally, interprets the test results. J. Reid and F. Inbau, *Truth and Deception* (2d ed. 1977). The recordings of the machine do not, in and of themselves, indicate whether the examinee has been truthful or deceptive. Rather, the ultimate conclusion is totally dependent upon the examiner's *interpretation* and *analysis* of the physiological changes measured by the polygraph. The entire process, then, is a combination of scientific measurement and human evaluation. Because human judgment in the role of the examiner is *intrinsic to the method*, human error is, perhaps, equally intrinsic. As such, considerable latitude should be permitted in the defendant's cross-examination of the examiner to insure that the reliability of the procedure is fully probed and to disabuse the jury of any mistaken impression that the polygraph is scientifically precise.

Under the factual circumstances of this case, we hold that the erroneous exclusion of this evidence relating to the earlier polygraph examination constitutes prejudicial error entitling defendant to a new trial. Considering defendant's corroborated alibi, Mr. Lee's failure to identify defendant and the varying descriptions relating to defendant's height and appearance, we conclude that there is a reasonable possibility that, had this error not been committed, a different result would have been reached.

We are aware that the examiner's testimony concerned a polygraph examination in which the questions related only to the burglary charge. We are of the opinion, however, that the admission of the results without proper opportunity for cross-examination requires that defendant receive a new trial on both charges. Defendant's defense rested upon an alibi, corroborated by the testimony of his brother and sister. Each testified that defendant could not have committed either offense because he did not leave his residence throughout the evening of 22 September 1981. The examiner's testimony that defendant was deceitful as to the burglary tended to lessen the credibility of defendant's claim that he was not involved in either offense. Defendant must, therefore, receive a new trial on both the rape and burglary charges.

### III.

[3] The circumstances presented in instant case prompt us to re-examine our rule permitting the trial judge, in the exercise of his discretion, to admit the results of a polygraph examination into evidence when the defendant, defense counsel and the prosecution have entered into a stipulation as to admissibility prior to trial.

Our discussion begins with a review of the development of North Carolina law relating to the admissibility of polygraph evidence in criminal trials.

Prior to 1975, the law in North Carolina was clear that evidence relating to polygraph examinations was inadmissible at trial. *State v. Jackson*, 287 N.C. 470, 215 S.E. 2d 123 (1975); *State v. Brunson*, 287 N.C. 436, 215 S.E. 2d 94 (1975); *State v. Foye*, 254 N.C. 704, 120 S.E. 2d 169 (1961). This rule was unaffected by a stipulation. Polygraph evidence was simply not admissible for any purpose.

In *State v. Foye, supra,* this Court enumerated four reasons which justified adherence to the well-established rule excluding evidence relating to polygraph examinations. The Court cited the following obstacles to the admissibility of polygraph evidence: (1) lack of general scientific recognition, (2) tendency to distract the jury, (3) the defendant's ability to have extrajudicial tests made without the necessity of submitting to similar tests by the prosecution, and (4) inability to cross-examine the polygraph machine. 254 N.C. at 708, 120 S.E. 2d at 172. These reasons for exclusion were reaffirmed in *State v. Brunson,* 287 N.C. 436, 445, 215 S.E. 2d 94, 100 (1975), when the Court again refused to change the rule relating to the inadmissibility of polygraph evidence.

The Court of Appeals in *State v. Steele,* 27 N.C. App. 496, 219 S.E. 2d 540 (1975), first considered the question of whether polygraph evidence should be admitted upon the basis of a pretrial stipulation between the parties. Following the lead of the Arizona Supreme Court in *State v. Valdez,* 91 Ariz. 274, 371 P. 2d 894 (1962), the court decided that if the parties stipulated to admissibility, and if other conditions were met, the results of polygraph evidence could be admitted. The other qualifications were as follows:

(1) That the county attorney, defendant and his counsel all sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state.

(2) That notwithstanding the stipulation the admissibility of the test results is subject to the discretion of the trial judge, i.e. if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence.

(3) That if the graphs and examiner's opinion are offered in evidence the opposing party shall have the right to cross-examine the examiner respecting:

a. the examiner's qualifications and training;

b. the conditions under which the test was administered;

c. the limitations of and possibilities for error in the technique of polygraphic interrogation; and

d. at the discretion of the trial judge, any other matter deemed pertinent to the inquiry.

(4) That if such evidence is admitted the trial judge should instruct the jury that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged but at most tends only to indicate that at the time of the examination defendant was not telling the truth. Further, the jury members should be instructed that it is for them to determine what corroborative weight and effect such testimony should be given.

27 N.C. App. at 500, 219 S.E. 2d at 543.

This Court did not consider the advisability of this approach until 1979. In *State v. Milano*, 297 N.C. 485, 256 S.E. 2d 154 (1979), we adopted the admissibility by stipulation rule without discussion.

It became clear in *Milano*, however, that this Court would require strict compliance with the provisions of the stipulation governing admissibility. In *Milano*, the trial court admitted into evidence unfavorable polygraph results obtained pursuant to stipulation. The defendant was not, however, permitted to offer the favorable results of a psychological stress evaluation because the stipulation did not explicitly permit evidence relative to the latter test. This Court affirmed the rulings of the trial judge. 297 N.C. at 500, 256 S.E. 2d at 162-63.

The most recent North Carolina case relating to the admissibility of polygraph results pursuant to stipulation is *State v. Meadows*, 306 N.C. 683, 295 S.E. 2d 394 (1982). In that case, the defendant received a new trial because the results of a polygraph test were admitted into evidence against him even though the stipulation authorizing the examination was not complied with. One of the conditions of admissibility was that the prosecutrix would submit to a "similar polygraph examination under the same terms, conditions and stipulations" governing the defendant's examination and that the results of her examination would also be admitted into evidence. *Id.* at 685, 295 S.E. 2d at 396. Both the defendant and the prosecutrix were scheduled to be examined on the same morning. They encountered each other in the polygraphist's office. According to the polygraphist, the confron-

tation so upset the prosecutrix that she became an unsuitable subject for examination. The results of the test administered to her that morning were inconclusive and the polygraphist administered another test to her at a later date. The defendant was also examined that first morning. The polygraphist testified that the defendant was not affected by the encounter and that the results obtained revealing deception were valid.

We held that by according the prosecutrix, but not the defendant, a second opportunity to take the polygraph, the polygraphist violated the provision of the stipulation which required that both the defendant and the prosecutrix take "a similar polygraph examination under the same terms [and] conditions." *Id.* at 686, 295 S.E. 2d at 396.

We hasten to note that in these cases permitting polygraph evidence upon stipulation of the parties, we have not implicitly recognized the reliability of the polygraph technique. Admissibility of this evidence has not been based on the validity and accuracy of the lie detector, but rather that by consenting to the evidence pursuant to stipulation, the parties have waived any objections to the inherent unreliability of the test. The stipulation itself and the other conditions set forth in *Steele* were to operate as a compromise between total rejection and complete acceptance of polygraph evidence.

The admission by stipulation approach has been widely criticized by courts and commentators. Many reject the stipulation approach as mechanistic and accomplishing little toward resolving the inherent defects in the polygraph technique and procedure. *See, e.g. People v. Anderson,* --- Colo. ---, 637 P. 2d 354, 361-62 (1981); *State v. Frazier,* 252 S.E. 2d 39, 45-46 (W.Va. 1979). Because the stipulation does not cure the unreliability of the evidence, commentators have labeled the practice paradoxical. "By what logic should stipulated polygraphic evidence be admissible when the same evidence without stipulation is barred?" Note, *The Polygraphic Technique: A Selective Analysis,* 20 Drake L. Rev. 330, 341 (1971). A similar view was expressed by the Maryland Court of Special Appeals in *Akonom v. State,* 40 Md. App. 676, 394 A. 2d 1213 (1978).

We find these cases unpersuasive and would venture to suggest that they are guilty of putting the cart before the

well-known horse. As we see it, the crucial issue is whether, as a matter of law, this type of evidence is sufficiently reliable or trustworthy. It cannot logically be argued that a stipulation enhances in any significant way the inherent reliability of evidence produced by a so-called scientific process or art.

*Id.* at 680, 394 A. 2d at 1216. *See also People v. Monigan,* 72 Ill. App. 3d 87, 88-89, 390 N.E. 2d 562, 562-63 (1979); *Pulakis v. State,* 476 P. 2d 474, 479 (Alaska 1970); Tarlow, *Admissibility of Polygraph Evidence in 1975: An Aid in Determining Credibility in a Perjury-Plagued System,* 26 Hastings L.J. 917, 953-56 (1975).

Two appellate courts, accepting these criticisms as well-taken, have reversed their position on this issue and no longer permit polygraph evidence pursuant to pretrial stipulation.[1]

Oklahoma was the first jurisdiction to abandon the rule admitting polygraph evidence upon stipulation. In *Fulton v. State,* 541 P. 2d 871 (Okla. Crim. App. 1975) [overruling *Castleberry v. State,* 522 P. 2d 257 (Okla. Crim. App. 1974) and *Jones v. State,* 527 P. 2d 169 (Okla. Crim. App. 1974)], that Court held that the potential unreliability of the polygraph test dictated its total exclusion.

In 1981, the Supreme Court of Wisconsin, in an exceptionally well-researched and scholarly opinion, held that polygraph evidence would no longer be admitted pursuant to stipulation. *State v. Dean,* 103 Wis. 2d 228, 307 N.W. 2d 628 (1981) [overruling *State v. Stanislawski,* 62 Wis. 2d 730, 216 N.W. 2d 8 (1974)]. In *Stanislawski,* the Court had earlier held that polygraph evidence

---

1. We note that a number of jurisdictions continue to refuse to admit polygraph evidence and have never experimented with the admission by stipulation approach. *Pulakis v. State,* 476 P. 2d 474 (Alaska 1970); *People v. Anderson,* --- Colo. ---, 637 P. 2d 354 (1981); *State v. Antone,* 62 Hawaii 346, 615 P. 2d 101 (1980); *People v. Monigan,* 72 Ill. App. 3d 87, 390 N.E. 2d 562 (1979); *Penn v. Commonwealth,* 417 S.W. 2d 258 (Ky. 1967); *State v. Catanese,* 368 So. 2d 975 (La. 1979); *State v. Gagne,* 343 A. 2d 186 (Me. 1975); *Akonom v. State,* 40 Md. App. 676, 394 A. 2d 1213 (1978); *People v. Rocha,* 110 Mich. App. 1, 312 N.W. 2d 657 (1981); *Jordon v. State,* 365 So. 2d 1198 (Miss. 1978); *State v. Biddle,* 599 S.W. 2d 182 (Mo. 1980) (en banc); *State v. Beachman,* --- Mont. ---, 616 P. 2d 337 (1980); *State v. Steinmark,* 195 Neb. 545, 239 N.W. 2d 495 (1976); *State v. French,* 119 N.H. 500, 403 A. 2d 424 (1979); *Commonwealth v. Pfender,* 280 Pa. Super. 417, 421 A. 2d 791 (1980); *State v. Watson,* 248 N.W. 2d 398 (S.D. 1976); *Jones v. Commonwealth,* 214 Va. 723, 204 S.E. 2d 247 (1974); and *State v. Frazier,* 252 S.E. 2d 39 (W.Va. 1979).

would be admissible subject to the same conditions that our Court of Appeals adopted in *State v. Steele, supra.* The Court in *Dean* concluded, however, that the *Stanislawski* rule was not functioning in a manner which enhanced the reliability of polygraph evidence and did not protect the integrity of the trial to the degree necessary to justify its continuance. 103 Wis. 2d at 229, 307 N.W. 2d at 629.

We are also persuaded by the criticisms directed to the admission by stipulation approach. As alluded to earlier in this opinion, we have never retreated from our basic position that polygraph evidence is inherently unreliable. Thus, we must determine whether the conditions placed upon the admissibility of polygraph evidence in *State v. Steele,* 27 N.C. App. 496, 500, 219 S.E. 2d 540, 543 (1975), and adopted by this Court in *State v. Milano,* 297 N.C. 485, 499, 256 S.E. 2d 154, 162 (1979), are sufficient to guard against the prejudicial factors inherent in polygraph evidence.

First, we are forced to conclude that the stipulation accomplishes little toward enhancing the reliability of the polygraph. By entering into a stipulation, the parties have merely agreed to the admissibility of the polygraph evidence, thereby waiving any objections to the basic theory of polygraphy. The stipulation is, then, based on principles of consent and waiver and does not even purport to deal with the difficult questions respecting the reliability of the polygraph as an accurate means to detect deception. It simply cannot logically be argued that any foundation as to accuracy is achieved by stipulation.

Our misgivings regarding the effectiveness of the stipulation to guarantee a reliable examination are tempered somewhat by our rule that, notwithstanding the stipulation, the admissibility of the test results is subject to the discretion of the trial judge. *State v. Meadows,* 306 N.C. 683, 686, 295 S.E. 2d 394, 396 (1982); *State v. Milano,* 297 N.C. 485, 499, 256 S.E. 2d 154, 162 (1979); *State v. Steele,* 27 N.C. App. 496, 500, 219 S.E. 2d 540, 543 (1975). If the presiding judge is not satisfied that the examiner is qualified or that the test was conducted under proper conditions, he may refuse to accept the polygraph evidence.

We are not convinced that this discretionary power is a sufficient safeguard to ensure reliability of the polygraph test results

in a particular case. In making this determination, we intend no criticism of the trial judges who have attempted to deal with the issues surrounding the admissibility of polygraph evidence. Rather, we are forced to conclude that the administration of justice simply cannot, and should not, tolerate the incredible burdens involved in the process of ensuring that a polygraph examination has been properly administered. If a trial court were to adequately police the reliability of stipulated results, the time required to explore the innumerable factors which could affect the accuracy of a particular test would be incalculable. *See* Note, *Polygraph Evidence Held Inadmissible in Criminal Trials in Wisconsin, State v. Dean,* 65 Marq. L. Rev. 697, 705 (1982).

Recognizing that a litigant could legitimately challenge the proffered results of a test on the basis of the motivation of the subject, the subject's physical and mental condition, the competence and attitude of the examiner, the wording of the relevant questions, and the interpretation of the test results, we are acutely aware of the possibility that the criminal proceeding may degenerate into a trial of the polygraph machine. *See United States v. Wilson,* 361 F. Supp. 510, 513 (D. Md. 1973); Abbell, *Polygraph Evidence: The Case Against Admissibility in Federal Criminal Trials,* 15 Am. Crim. L. Rev. 29, 50-52 (1977). The introduction and rebuttal of polygraph evidence, if all the possibilities for error in the polygraphic process were deeply explored, could divert the jury's attention from the question of the defendant's guilt or innocence to a judgment of the validity and limitations of the polygraph. It is our view that the *Steele* conditions do not satisfactorily deal with this problem. They provide no safeguards to protect against the spectre of trial by polygraph. In fact, we question whether it would even be appropriate to limit the manner in which the admitted polygraph results could be challenged in view of the recognized unreliability of the test.

We are also disturbed by the possibility that the jury may be unduly persuaded by the polygraph evidence. The Eighth Circuit Court of Appeals expressed their concern in this way:

> When polygraph evidence is offered in evidence at trial, it is likely to be shrouded with an aura of near infallibility, akin to the ancient oracle of Delphi. During the course of laying the evidentiary foundation at trial, the polygraphist will

present his own assessment of the test's reliability which will generally be well in excess of 90 percent. He will also present physical evidence, in the form of the polygram, to enable him to advert the jury's attention to various recorded physiological responses which tend to support his conclusions. Based upon the presentment of this particular form of scientific evidence, present-day jurors, despite their sophistication and increased educational levels and intellectual capacities, are still likely to give significant, if not conclusive, weight to a polygraphist's opinion as to whether the defendant is being truthful or deceitful in his response to a question bearing on a dispositive issue in a criminal case. To the extent that the polygraph results are accepted as unimpeachable or conclusive by jurors, despite cautionary instructions by the trial judge, the jurors' traditional responsibility to collectively ascertain the facts and adjudge guilt or innocence is preempted.

*United States v. Alexander*, 526 F. 2d 161, 168 (8th Cir. 1975).

It may be argued that cautionary instructions are sufficient to overcome this objection. One of the *Steele* conditions is that the jury be instructed to consider evidence of the polygraph results only as they relate to whether the defendant was telling the truth at the time of the examination. The jury must be told that the examiner's testimony is not intended to prove or disprove any element of the crime with which the defendant is charged.

Again, we turn to the Eighth Circuit for appropriate language revealing the potential decisiveness of polygraph testimony despite cautionary instructions.

If the expert testimony is believed by the jury, a guilty verdict is usually mandated. The polygraphist's testimony often is not limited to mere identification or any other limited aspect of defendant's possible participation in the criminal act. Through the testimony of the polygraph expert relating to whether the defendant was being truthful in his responses concerning participation in the crime, the expert is thus proffering his opinion based on scientific evidence bearing upon the sole issue reserved for the jury — is the defendant innocent or guilty?

*United States v. Alexander,* 526 F. 2d at 169.

We conclude from this discussion that the admission by stipulation approach does not resolve some of the more perplexing problems attendant to the use of polygraph evidence. The validity of the polygraphic process is dependent upon such a large number of variable factors, many of which are extremely difficult, if not impossible, to assess, that we feel the stipulation simply cannot adequately deal with all situations which might arise affecting the accuracy of any particular test.

We therefore hold that in North Carolina, polygraph evidence is no longer admissible in any trial. This is so even though the parties stipulate to its admissibility. The rule herein announced shall be effective in all trials, civil and criminal, commencing on or after the certification date of this opinion, including the retrial of this case. *State v. Steele, supra, State v. Milano, supra,* and *State v. Meadows, supra,* are expressly overruled to the extent that they are in conflict with this decision. We wish to make it abundantly clear, however, that this rule does not affect the use of the polygraph for investigatory purposes.

For the reasons earlier stated regarding the exclusion of evidence relating to the first polygraph examination administered to defendant, there must be a

New trial.

Justice FRYE did not participate in the consideration or decision of this case.