STATE OF NORTH CAROLINA v. ROBERT NORTHROP MITCHELL, JR.

No. 26A90

(Filed 2 May 1991)

**Criminal Law § 62 (NCI3d)— homicide—reference to lie detector test—no plain error**

There was no plain error in a prosecution for murder and conspiracy to murder where two witnesses referred to polygraph tests. There was no mention of the results of the test of one witness, which was done for investigative purposes, and the apparent effect of another witness's admission that he had failed the polygraph test would be to cast doubt upon his veracity as a witness for the State. The results of polygraph testing have been held inadmissible, but the mere mention of polygraph testing does not necessitate appellate relief and

the rule that polygraph evidence is no longer admissible does not affect the use of the polygraph for investigatory purposes.

**Am Jur 2d, Evidence § 831; Witnesses § 435.**

APPEAL as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by *Manning, J.,* at the 17 August 1989 Criminal Session of Superior Court, ANSON County, upon a jury verdict of guilty of first degree murder and conspiracy. Heard in the Supreme Court 10 April 1991.

*Lacy H. Thornburg, Attorney General, by Isaac T. Avery, III, Special Deputy Attorney General, and Hal F. Askins, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Staples Hughes, Assistant Appellate Defender, for defendant-appellant.*

FRYE, Justice.

Defendant was indicted on 23 January 1989 for conspiracy to commit murder and the 16 October 1988 murder of John Clark Jones. The cases were tried together as noncapital cases. On 17 August 1989, the jury returned a verdict finding defendant guilty of conspiracy to commit murder and murder in the first degree. The court imposed a life sentence, the offenses having been consolidated for the purpose of judgment. Defendant appealed, and his motion to bypass the North Carolina Court of Appeals on the conspiracy conviction was allowed by this Court on 12 September 1990.

The State's evidence tended to show that defendant, Robert Northrop Mitchell, Jr., and Karen Jones, wife of the deceased, had an extramarital affair beginning in early 1987 and lasting approximately one year. In late August 1988, defendant met Dennis Davis for the first time, and defendant told Davis that he wanted John Jones "knocked off," because he was dating John Jones' wife. Davis quoted defendant a price of $10,000 for killing Jones, but defendant said that he could only pay $4,700. Davis told defendant that he and David Watts would get back in touch with him.

Defendant called Davis on several occasions following the initial meeting to finalize the agreement and work out the details concerning the killing of John Jones. Around midnight on 15 October 1988, Ms. Connie Singletary, Davis' girlfriend, went to Mr.

Jones' house and told him that she was having automobile trouble and needed his help. Mr. Jones got dressed and he and Ms. Singletary left in his truck. When they arrived at Ms. Singletary's automobile, she got out of the truck and drove off in her automobile. As Mr. Jones got out of his truck, Davis shot him. Jones got back into the truck and Davis shot him again through the driver's window. Davis then threw a jar of gasoline into the truck and ignited it.

On 16 October 1988, Anson County Sheriff's Detective Dave Johnson and Jay Tilley, a State Bureau of Investigation (SBI) agent, discovered a burned body in a burned pickup truck at the intersection of Rural Paved Road 1228 and Rural Paved Road 1240 in Anson County. The truck was registered to Jones Tire Company, which was owned and operated by the deceased, John Clark Jones. Two shotgun shells were found in the area and there were several projectile holes in the hood, left sideview mirror, and right door of the truck.

An autopsy was performed on the body and it was determined to be the body of John Jones. The autopsy showed that the victim's body contained six buckshot type shotgun pellets and several smaller fragments of metal. It was the opinion of the forensic pathologist that the cause of John Jones' death was a shotgun wound, specifically buckshot to the head, neck and chest.

Prior to the homicide, defendant paid Davis $1,500 in cash and gave him a saddle worth approximately $1,200. The day after the murder, defendant called Davis and told him that he had heard about the killing on the news. Defendant thought that he might be a prime suspect, so he wanted Davis to wait for the rest of the money. About one week later, defendant and Davis met and defendant gave Davis either $1,000 or $1,500 as partial payment for killing Jones. Defendant met with Davis on another occasion after 30 October 1988 and gave Davis an additional $1,000.

One or two weeks prior to the week of 15 October 1988, defendant told Walker Harrington McCollum, a co-worker, that he needed him to "cover" some money for him in the amount of about $2,000. After becoming aware of the death of John Jones, McCollum had a conversation with defendant who told him to stick to his story about the money. Two SBI agents interviewed McCollum a week later and he told them that he got money from defendant to pay child support. However, McCollum's mother told the SBI agents that she had given McCollum the money for the support payments

and court cost. McCollum then confessed that he had not received any money from defendant and agreed to cooperate with the investigation.

On 19 January 1989, McCollum agreed to wear a recording device and went to defendant's house at about 8:30 p.m. on that night. Defendant again told McCollum to stick to his story. The next day, while wearing the recording device, McCollum talked with defendant and defendant told him that he was not worried about Dennis Davis talking, but he was concerned about Davis' wife, the former Ms. Connie Singletary.[1]

Defendant offered no evidence. The jury convicted defendant of first degree murder and conspiracy to commit murder.

Defendant contends that the trial court committed plain error by failing to strike testimony concerning the results of polygraph testing. Defendant complains that evidence that McCollum had failed a polygraph test, when considered with evidence implying that Karen Jones had passed a polygraph test, injected an unacceptable degree of unreliability into the trial and was likely a factor in the jury's verdict, thus entitling him to a new trial.

With reference to McCollum, the initial monitored and recorded conversation between McCollum and defendant, which was played in open court, began as follows:

MCCOLLUM: Boy, what in the hell are you doing?

MITCHELL: What you say?

MCCOLLUM: Chicken, them [expletive] been back to the house . . . . I got off work and they was there. They coming down hard, Cat. They been down there, they been to Mama's, wanted to know what she had done with the money that she borrowed the day I went to court. I don't know what the hell I'm going to do. Trying to say David, David is trying to say that I'm the one that carried you down there and set it up, and Cat, you know.

MITCHELL: I don't believe David said that. I swear I don't.

---

1. Davis married Ms. Singletary a few weeks after the homicide, believing that this would prevent her from testifying against him.

MCCOLLUM: Man, [expletive], man that ain't right to start with you know.

MITCHELL: Well, I know that.

MCCOLLUM: But, you know, I don't know what in the hell —I don't know what is coming up. They are talking about the grand jury because I failed my damned polygraph. Wanting to get the grand jury, trying to throw it up to me. I don't know if they are trying to scare me or what.

The monitored and recorded conversation between the two men on the next day contained reference not only to McCollum, but also to defendant having taken a polygraph test. The conversation was as follows:

MCCOLLUM: Well, I'm gone, Cat. I just wanted to know and you in on—

MITCHELL: They going to know we talked. What the hell? [Expletive], if they talk to you or they talk to me I will tell them you told me about going to take the test and all.

MCCOLLUM: The polygraph and all?

MITCHELL: Uh-huh.

MCCOLLUM: Boy, they throwed that [expletive] in—

MITCHELL: Just tell them — just tell them, [expletive], that I apologized to you for having to go through all that [expletive]. (Inaudible.) I heard that a good while and then they ain't said a [expletive] word about it. Well, they did. The last thing they said about it, asked me would I be willing to take another one. I said, yes. I told the truth on the first one and I'll tell it on the next one.

On cross-examination by defense counsel, Karen Jones testified as follows:

Q. You have also talked with the SBI, have you not?

A. Yes.

Q. And the SBI accused you of being involved in this, did they not?

A. No.

Q. Didn't you tell Mr. Mitchell that they were telling you that you were involved?

A. I took a polygraph.

In response to questions by the court Mrs. Jones further testified as follows:

THE COURT: How long after your husband's death did you come under suspicion or believe you were under suspicion as far as the SBI was concerned and the sheriff's department?

A. How soon?

THE COURT: When did they start questioning you so you felt they thought you were involved in your husband's death? How soon after the funeral?

A. I took a polygraph that week.

THE COURT: The first week?

A. Yes.

THE COURT: Did they continue to question you after that?

A. Yes.

THE COURT: How long after you took the polygraph and they continued to question you did they start sending you back to Robby Mitchell with things that were not exactly correct, telling you to tell him information that you knew was not correct?

A. About a week.

THE COURT: Did all this occur right after the death?

A. I think so. I took the polygraph right after that.

The State contends that it presented direct evidence at trial that established that Dennis Davis was hired by defendant to commit the murder in question and that Davis killed John Jones. Neither the State nor defendant offered any evidence to the contrary. The State argues that the evidence complained of by defendant merely involved statements of peripheral witnesses and did not have any effect upon the outcome of the trial. We are inclined to agree.

STATE v. MITCHELL

[328 N.C. 705 (1991)]

Defendant did not object to any of the above testimony and made no motion to strike. Thus, we consider this assignment of error under the "plain error" rule or standard. Before granting a new trial to a defendant under the plain error rule or standard, the appellate court must be convinced that absent the alleged error, the jury probably would have reached a different verdict. *State v. Black*, 308 N.C. 736, 303 S.E.2d 804 (1983).

> [T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a "fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has " 'resulted in a miscarriage of justice or in the denial to appellant of a fair trial' " or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings" or where it can be fairly said "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty."

*Id.* at 740-41, 303 S.E.2d at 806-07, quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982).

The results of polygraph testing have been held inadmissible in North Carolina even where the parties stipulate to their admissibility. *State v. Grier*, 307 N.C. 628, 300 S.E.2d 351 (1983); *State v. Jackson*, 287 N.C. 470, 215 S.E.2d 123 (1975). However, the mere mention of polygraph testing does not necessitate appellate relief. *See State v. Harris*, 323 N.C. 112, 371 S.E.2d 689 (1988).

In the instant case, there was no mention of the results of Karen Jones' polygraph test, which was done for investigative purposes. Also, the trial court's inquiry of Karen Jones seems to have been an attempt by the trial judge to establish a time frame as to when certain acts occurred. This Court held in *Grier* that polygraph evidence is no longer admissible in any trial; however, the rule does not affect the use of the polygraph for investigatory purposes. *State v. Grier*, 307 N.C. at 645, 300 S.E.2d at 361. The limited testimony concerning the investigatory polygraph of Karen Jones, even if erroneously admitted, did not affect the jury verdict.

IN RE BULLOCK

[328 N.C. 712 (1991)]

With reference to McCollum's admission that he failed the polygraph test, we fail to see how the admission prejudiced defendant. The apparent effect of McCollum's admission would be to cast doubt upon his veracity as a witness for the State, thus weakening, rather than strengthening, the State's case against defendant. In any event, considering the evidence in its entirety and assuming error arguendo, we are not convinced, absent the alleged error, that the jury probably would have reached a different verdict. Thus, plain error has not been shown.

We conclude that defendant's trial was free of prejudicial error.

No error.