STATE OF NORTH CAROLINA v. KEVIN JAVAN HAIRSTON, DEFENDANT

STATE OF NORTH CAROLINA v. DARRELL NATHANIEL HAIRSTON, DEFENDANT

No. COA95-1304

(Filed 17 September 1996)

## 1. Evidence and Witnesses § 1457 (NCI4th)— blood sample— chain of custody—identity of person drawing blood

The trial court did not err by admitting into evidence in a prosecution for armed robbery, burglary and rape defendant's blood sample where defendant contended that the State did not adequately establish the chain of custody due to insufficient evidence of who actually drew the blood. The testimony indicates

that either the doctor who testified or his nurse drew the blood and that no one else was having their blood drawn by the doctor when defendant was with him. Any doubt as to the collection procedure of the blood and any weakness in the chain of custody relates only to the weight to be given to the evidence and not to its admissibility.

**Am Jur 2d, Evidence §§ 948, 949; Expert and Opinion Evidence § 300.**

**Admissibility in evidence of sample or samples of article or substance of which the quality, condition, or the like is involved in litigation. 95 ALR2d 681.**

2. **Evidence and Witnesses § 2209 (NCI4th)— forensic serology—qualification of witness as expert**

The trial court did not err in a prosecution for armed robbery, burglary and rape by finding that a witness was an expert in forensic serology where the witness had a degree in biology from Appalachian State University, he was employed with the FBI in Washington, D.C. where he received training in the field of forensic serology, he is currently employed by the SBI and has worked in the forensic serology unit for sixteen years, he has testified as an expert in the field of forensic serology approximately two hundred times, and he has attended various seminars on the topic of forensic serology. The witness had particularized training and experience in forensic serology and was properly accepted by the trial court as an expert.

**Am Jur 2d, Expert and Opinion Evidence §§ 53-67.**

3. **Evidence and Witnesses § 2211 (NCI4th)— DNA—qualification of witness as expert**

The trial court did not err in a prosecution for armed robbery, burglary and rape by qualifying as an expert in forensic DNA analysis a witness who was currently the assistant director of the forensic identity unit at Roche Bio-medical Laboratories in the Research Triangle Park; at the time of the crime she was a special agent with the SBI and worked in the DNA analysis unit of the serology section; she had a degree in biology and a master's in genetics from North Carolina State; she had approximately a year and a half of in-house training consisting of learning to perform forensic DNA analysis, performing hundreds of blood sam-

STATE v. HAIRSTON

[123 N.C. App. 753 (1996)]

ples and other kinds of samples, taking a series of proficiency tests and participating in a case internship program under the direction of another trained and qualified DNA analyst; she attended two DNA classes specifically focusing on forensic DNA analysis at the FBI Academy in Quantico, Virginia; and she has previously testified in court and given her opinion as an expert witness in forensic DNA analysis.

**Am Jur 2d, Expert and Opinion Evidence §§ 53-67.**

**Admissibility of DNA identification evidence. 84 ALR4th 313.**

**4. Appeal and Error § 147 (NCI4th)— general objection at trial—grounds not apparent from context—assignment of error not addressed**

An assignment of error to the trial court's denial of defendant's request to voir dire a DNA expert as to testing procedures was not addressed on appeal where defendant made only a general objection at trial and the grounds of the objection were not apparent from the context.

**Am Jur 2d, Appellate Review §§ 614, 615.**

**5. Criminal Law § 1097 (NCI4th)— Fair Sentencing Act—balancing mitigating and aggravating factors—discretion of trial court**

The trial court did not err in sentencing defendant where defendant contended that his sentence was disproportionate in relation to those most defendants receive for the same or similar offenses where the trial court found no factors in mitigation and found as an aggravating factor that defendant had a prior conviction or convictions punishable by more than sixty days' confinement. The balance struck by the trial court when weighing mitigating and aggravating factors will not be disturbed if there is support in the record for the trial court's determination.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Court's right, in imposing sentence, to hear evidence of, or to consider, other offenses committed by defendant. 96 ALR2d 768.**

Appeal by defendant Darrell Nathaniel Hairston from judgment entered 2 June 1995 by Judge Julius A. Rousseau, Jr., in Wilkes County Superior Court. Heard in the Court of Appeals 21 August 1996.

*Attorney General Michael F. Easley, by Special Deputy Attorney General Lars F. Nance, for the State.*

*John W. Gambill for Darrell Nathaniel Hairston, defendant appellant.*

SMITH, Judge.

On 13 November 1993, the victim was sleeping in her home, along with her three children aged 10, 11 and 17 in North Wilkesboro, North Carolina. In the early morning hours she was awakened by a noise in her living room. She looked down the hallway and could see figures going back and forth in the living room. She thought it was her oldest son, as he had the habit of getting out of bed and watching T.V. late at night. The victim called out to her son several times to tell him to go back to bed. When he did not answer, she said she was going to count to three, and then she was going to go into the living room to make him go back to bed. She began to count and when she got to two, defendant ran down the hallway and lunged at her. Defendant jumped on the victim's bed and knocked her off onto the floor. Defendant fell on top of the victim, and then pulled her up by her arm and held a razor to her neck. The victim described the razor as being a utility knife, approximately six inches in length. As the defendant held the knife against her neck he said, "Shhh. Shhh. Be quiet. Be quiet. I won't hurt you if you be quiet. If you scream, I will hurt you." He asked the victim if she understood, and she said, "Yes." He then took the knife away from her neck, and she started to scream. Defendant put the razor back against her neck and said, "I mean business. I will kill you if you scream again. Tell me where your money is. You're not going to scream again, are you?" She shook her head no, and he took the razor away. The victim screamed again and called out, "Please don't hurt me," and she tried to fight him. She reached up to grab his hair and his toboggan fell off his head. At this point, his face was right in front of hers. He asked her again where her money was. The victim told him where it was and begged him to just take it and go. The victim started looking at her telephone, and the defendant reached over and cut the phone wire. The defendant then pulled the victim up and around to the foot of her bed, where she fell to the floor. The victim

grabbed the foot of her bed and held onto it saying, "No, I'm not going." The defendant yelled, "Come on, come on," and he grabbed the victim's necklace and tried to pull it off her neck. He said, "I want that necklace." The victim protested and tried to get the necklace off to give it to the defendant, but he jerked her arm and threw her back down onto the floor.

A second man, later identified as Kevin Javan Hairston, came into the room and knelt on the bed and leaned down and said something to the defendant. The two men whispered to each other and then Kevin went back into the living room. The defendant began to pull the victim's clothing, and she started to run towards the bedroom door. Defendant was pulling at her underwear, and as she started to run out of the room Kevin came back into the bedroom. Defendant said to Kevin, "Help me here." Both men knocked the victim to the floor. The defendant started to choke the victim, and she almost blacked out. Kevin put his knee on the victim's chest to hold her down and held the razor against her neck, while defendant raped the victim. While defendant raped the victim, Kevin tried to make the victim perform a sexual act on him, but the victim would not. The victim remembers that the defendant ejaculated and then said to Kevin, "Come on, you can do this." The defendant held down the victim, while Kevin raped her. The victim testified that Kevin continued to rape her until he seemed to finish, but she was not positive that he ejaculated, as she was hysterical at that point.

Defendant and Kevin dragged the victim to her feet, and she asked if she could put on some underwear. They let her do so, and then demanded to know where her money was. The victim said, "I told you to start with where my money was, I said it's over there beside the bed there, or it's in the living room beside the T.V. stand." Kevin went into the living room to look for the money, leaving the victim with defendant in the bedroom. When defendant could not find the money in the bedroom, he ordered the victim to start walking out of the bedroom. He said, "Come on. Let's see you walk." The victim walked into the hallway and went into the living room. The victim noticed that defendant and Kevin were looking at each other and not at her, so she lunged for the front door. The victim ran outside and saw a police car driving up to her house. The victim's oldest son had escaped from the house and called the police from a neighbor's house during the attack.

Defendant was convicted of one count of attempted robbery with a dangerous weapon, one count of first degree burglary and one

count of first degree rape. He was sentenced to forty years for the armed robbery charge, fifty years for the first degree burglary charge, and life in prison for the first degree rape charge. Defendant appeals.

[1] Defendant first assigns error to the admission into evidence of State's Exhibit No. 36, defendant's blood sample, which he provided at the hospital for the Rape Suspect Evaluation Kit. Defendant argues that the State did not adequately establish the chain of custody of the exhibit because sufficient evidence of who actually drew the blood was not presented. We disagree.

The North Carolina Supreme Court has stated that the person who draws the blood sample need not always testify to establish a proper foundation for the admission of the sample. *State v. Grier*, 307 N.C. 628, 632, 300 S.E.2d 351, 354 (1983), *appeal after remand*, 314 N.C. 59, 331 S.E.2d 669 (1985). Further, lack of specificity as to the collection procedures of a blood sample will not lead to a rejection of the evidence unless there is a crucial reason for requiring such evidence of specificity. "The lack of such evidence was crucial in *Robinson* [*v. Life and Casualty Ins. Co.*, 255 N.C. 669, 674, 122 S.E.2d 801, 804 (1961)] because it was necessary to determine whether the [blood] sample had been taken before or after the deceased had been injected with embalming fluid." *Grier*, 307 N.C. at 633, 300 S.E.2d at 354. "There was, then, good reason to require specificity as to who drew the blood and when the blood was drawn since the injection of embalming fluid would obviously taint any findings as to the presence of alcohol in the bloodstream." *Id.*

In the present case, the State's witness, John C. Potter, M.D., a physician at Wilkes Regional Medical Center testified that, on 15 November 1993, police brought defendant to the hospital for specimen collections for a Rape Suspect Evaluation Kit. Potter testified that he collected from defendant pubic hair, saliva samples, hair samples from the head and blood samples. At trial, Potter identified each specimen from the kit and each specimen, except for the blood sample, was admitted into evidence without objection. The following colloquy took place at trial:

Q. I'm marking the object I've removed from State's 28 as State's Exhibit Number 36 and handing it to you, Doctor. Can you identify that, please, sir?

A. Yeah, these are the blood samples that were drawn on Darrell Hairston.

Q. And, are . . . do you recognize your own signature. . . .

A. . . . oh, surely, this is my handwriting, and it says "Darrell Hairston" as well as the date and time and my signature.

Q. Okay.

MRS. HARDING: State would move to introduce State's . . . .

MR. GAMBILL: . . . .OBJECTION.

THE COURT: Sir?

MR. GAMBILL: OBJECTION. No foundation has been laid to who drew the blood.

THE COURT: Who did draw the blood?

A. As I say, typically, when I sign that, I know that I drew the blood. If I did not draw the blood personally . . . sometimes a nurse in attendance will actually physically draw the blood while I'm standing there and then place it in the box.

THE COURT: OVERRULED.

MRS. HARDING: Introduce State's 36 then, please, Your Honor.

THE COURT: All right.

On cross-examination the defense asked Doctor Potter if he had taken samples from two different people at the same time, and the Doctor responded, "They were separated by about an hour it seems from looking at the record." The testimony indicates that either Dr. Potter or his nurse drew the blood from the defendant and that no one else was having their blood drawn by Dr. Potter when defendant was with him. Thus, any doubt as to the collection procedure of the blood and any weakness in the chain of custody of the blood sample relates only to the weight to be given to the evidence and not to its admissibility. *State v. Detter*, 298 N.C. 604, 634, 260 S.E.2d 567, 588 (1979); *Grier*, 307 N.C. at 633, 300 S.E.2d at 354. We find no error.

[2] Defendant's second and third assignments of error relate to expert witnesses, and we will address them together. Defendant assigns error to the trial court's findings that D.J. Spittle was an expert in forensic serology and that Anita L. Matthews was an expert in forensic DNA analysis. We disagree.

An expert witness is a witness whose study or experience, or both, makes the witness better qualified than the jury to form an opin-

ion on a particular subject. *Federal Paper Board Co. v. Kamyr, Inc.*, 101 N.C. App. 329, 334, 399 S.E.2d 411, 415, *disc. review denied*, 328 N.C. 570, 403 S.E.2d 510 (1991). A witness may be qualified as an expert if the trial court finds that through "knowledge, skill, experience, training, or education" the witness has acquired such skill that he or she is better qualified than the jury to form an opinion on the particular subject. N.C. Gen. Stat. § 8C-1, Rule 702 (Cum. Supp. 1995). "Whether a witness has the requisite skill to qualify as an expert in a given area is chiefly a question of fact, the determination of which is ordinarily within the exclusive province of the trial court." *State v. Goodwin*, 320 N.C. 147, 150, 357 S.E.2d 639, 641 (1987) (citations omitted). "It is enough that the expert witness 'because of his expertise is in a better position to have an opinion on the subject than is the trier of fact.' " *State v. Evangelista*, 319 N.C. 152, 164, 353 S.E.2d 375, 384 (1987) (quoting *State v. Wilkerson*, 295 N.C. 559, 569, 247 S.E.2d 905, 911 (1978)).

At trial, the State called D.J. Spittle to testify as an expert witness in forensic serology. Before the State tendered him as an expert witness, Spittle testified to the following: (1) He has a degree in biology with a minor in chemistry and a master's degree in biology from Appalachian State University. (2) He was employed with the Federal Bureau of Investigation ("FBI"), in Washington, D.C. where he received training in the field of forensic serology. (3) He is currently employed by the North Carolina State Bureau of Investigation ("SBI"), and has worked in the forensic serology unit for sixteen years. (4) He has testified as an expert in the field of forensic serology approximately two hundred times, and he has attended various seminars on the topic of forensic serology. This testimony established that the witness had particularized training and experience in forensic serology, and he was properly accepted by the trial court as an expert in that area. We find no error.

[3] The State also called Anita L. Matthews to testify as an expert in forensic DNA analysis. Before the State tendered her as an expert witness, she testified to the following: (1) She is currently the assistant director of the forensic identity unit at Roche Bio-medical Laboratories in Research Triangle Park. (2) At the time of the crime she was a special agent with the SBI and worked in the DNA analysis unit of the serology section. (3) She has a degree in biology and a master's degree in genetics from North Carolina State. (4) When she started with the SBI she had approximately a year and a half of in-house training consisting of learning how to perform forensic DNA

analysis, performing hundreds of blood samples and other kinds of samples, taking a series of proficiency tests and participating in a case internship program under the direction of another trained and qualified DNA analyst. (5) She attended two DNA classes specifically focusing on forensic DNA analysis at the FBI Academy in Quantico, Virginia, and has previously testified in court and given her opinion as an expert witness in forensic DNA analysis. Again, we find that, based on her training and experience in the area of forensic DNA analysis, Anita L. Matthews was properly accepted by the trial court as an expert in that field.

[4] Defendant next assigns error to the trial court's denial of defendant's request to voir dire State's witness Anita L. Matthews as to testing procedures. We decline to address this assignment of error as it was not properly preserved for review.

"[A] general objection, if overruled, is ordinarily not effective on appeal." *State v. Hamilton*, 77 N.C. App. 506, 509, 335 S.E.2d 506, 508 (1985), *disc. review denied*, 315 N.C. 593, 341 S.E.2d 33 (1986); N.C. Gen. Stat. § 8C-1, Rule 103(a) (1992). Further, N.C.R. App. P. 10(b)(1) (1996) provides:

> In order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context.

This Court will not consider arguments based upon matters not presented to, or adjudicated by the trial tribunal. *State v. Smith*, 50 N.C. App. 188, 190, 272 S.E.2d 621, 623 (1980) (citations omitted).

At trial, defendant made a general objection to Anita L. Matthews' testimony and requested voir dire. The grounds of the objection are not apparent from the context, and we decline to address the merits of this assignment of error.

[5] Defendant's last assignment of error is that the trial court erred in sentencing defendant in that his sentence was disproportionate in relation to those most defendants receive for the same or similar offenses in North Carolina. We disagree.

"The balance struck by a trial court when weighing mitigating and aggravating factors will not be disturbed if there is support in the record for the trial court's determination." *State v. Canty*, 321 N.C. 520, 527, 364 S.E.2d 410, 415 (1988).

Once a trial court has found, by the preponderance of the evidence, that aggravating factors outweigh mitigating factors, the trial court has the discretion not only to increase the sentence above the presumptive term, but also the discretion to determine to what extent the sentence will be increased.

*Id.* (citing *State v. Melton,* 307 N.C. 370, 380, 298 S.E.2d 673, 680 (1983)).

In the present case, the trial court found no factors in mitigation and found as an aggravating factor that the defendant has a prior conviction or convictions for criminal offenses punishable by more than sixty days' confinement. Defendant was sentenced to consecutive terms of fifty years for first degree burglary, forty years for attempted armed robbery and a mandatory life sentence for first degree rape. We find adequate support in the record for the trial court's determination of defendant's sentence. In defendant's trial we find

No error.

Chief Judge ARNOLD and Judge MARTIN, John C., concur.